Ellen Relkin (N.J. Attorney Bar #006691985)
WEITZ & LUXENBERG
*A New York Professional Corporation*
220 Lake Drive East, Suite 210
Cherry Hill, NJ 08002
Telephone:  (212) 558-5500
Email:  ERelkin@weitzlux.com


*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANK BARNETT, ALETHA BENTELE, DIANNA GILMORE, MARK GOLDSMITH, RITCH HOARD, and TREMAYNE SIRMONS<br><br>        Plaintiffs,<br><br>   v.<br><br>NOVO NORDISK INC., ELI LILLY AND COMPANY, SANOFI-AVENTIS U.S., LLC, EXPRESS SCRIPTS HOLDING COMPANY, EXPRESS SCRIPTS, INC., CVS HEALTH CORP., and UNITEDHEALTH GROUP, INC., OPTUMRX, INC.,<br><br>        Defendants. | Civil Action No.<br><br>**COMPLAINT and DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ................................................................................................. 1

II. PARTIES ............................................................................................................. 4

    A. Plaintiffs ................................................................................................. 4

    B. Defendants ............................................................................................. 6

III. JURISDICTION AND VENUE ......................................................................... 8

IV. DIABETES AND INSULIN ............................................................................... 9

    A. Diabetes and How Insulin Works ......................................................... 9

    B. The Origins of Insulin Treatment ....................................................... 10

    C. Analog Insulins Dominate .................................................................. 13

    D. Analog insulins are fungible .............................................................. 14

V. MARKETPLACE ACTORS INVOLVED IN DRUG PRICING AND DISTRIBUTION .............................................................................................. 15

VI. CHAIN OF DISTRIBUTION ........................................................................... 18

VII. RISING DRUG LIST PRICES HURT CONSUMERS ..................................... 18

VII. DRUG COSTS FOR CONSUMERS ................................................................ 20

    A. Uninsured ............................................................................................ 20

    B. High Deductible Plans, Coinsurance And Copay Requirements ......... 20

    C. Medicare Part D .................................................................................. 23

VIII. THE LOCKSTEP INCREASES TO INSULIN BENCHMARK PRICES ...... 24

    A. Long-Acting Insulin WAC Hikes ....................................................... 25

    B. Rapid-Acting Insulin WAC Hikes ...................................................... 27

VIII. THE "REBATE" GAME ................................................................................... 33

    A. PBMs Demand and Receive Payment From Insulin Manufacturers In Exchange For Customer Allocation ..................................................... 33

B. Eli Lilly, Novo Nordisk and Sanofi Explain the *Quid Pro Quo* With PBMs....... 36

IX. THE REBATE GAME AND RESULTING INCREASED LIST PRICES INJURE THE CONSUMER ................................................................................................ 39

X. RELEVANT MARKET ................................................................................................ 41

XI. TRADE AND COMMERCE ....................................................................................... 41

XII. TOLLING THE STATUTE OF LIMITATIONS ......................................................... 42

A. Fraudulent Concealment and Tolling ................................................................ 42

XIII. CLASS ACTION ALLEGATIONS ............................................................................ 43

XIV. CLAIMS FOR RELIEF ............................................................................................... 50

COUNT ONE ........................................................................................................................... 50

COUNT TWO ........................................................................................................................... 51

COUNT THREE ....................................................................................................................... 53

COUNT FOUR ......................................................................................................................... 80

COUNT FIVE ........................................................................................................................... 125

A. The Levemir/Novolog Pricing Enterprise .......................................................... 125

B. Conduct of the Levemir/Novolog Pricing Enterprise ......................................... 131

C. Novo Nordisk's Pattern of Racketeering Activity .............................................. 133

D. Novo Nordisk's Use of the U.S. Mail and Interstate Wire Facilities.................. 135

E. Damages Caused by Novo Nordisk's Levemir and Novolog Pricing Fraud ....... 137

COUNT SIX .............................................................................................................................. 139

A. The Humalog Pricing Enterprise ....................................................................... 140

B. Conduct of the Humalog Pricing Enterprise ...................................................... 145

C. Eli Lilly's Pattern of Racketeering Activity ...................................................... 147

D. Eli Lilly's Use of the U.S. Mail and Interstate Wire Facilities.......................... 149

E. Damages Caused by Eli Lilly's Humalog Pricing Fraud.................................... 151

COUNT SEVEN ....................................................................................................................... 153

A.    The Lantus Pricing Enterprise ................................................................ 154

B.    Conduct of the Lantus Pricing Enterprise ............................................ 159

C.    Sanofi's Pattern of Racketeering Activity ............................................ 161

D.    Sanofi's Use of the U.S. Mail and Interstate Wire Facilities .............. 162

E.    Damages Caused by Sanofi's Lantus Pricing Fraud ............................ 165

XV.    PRAYER FOR RELIEF ................................................................................ 167

XVI.    DEMAND FOR JURY TRIAL ..................................................................... 168

## I.     INTRODUCTION

1.      Defendants Eli Lilly and Company ('Eli Lilly"), Novo Nordisk, Inc. ("Novo Nordisk"), and Sanofi-Aventis U.S., LLC "(Sanofi") (collectively, "Drug Manufacturer Defendants")  have implemented continuous, lockstep increases to the list prices of their respective analog insulin drugs in the United States since at least 2013.

2.      The list price increases have made the out-of-pocket cost of life-saving insulin treatment skyrocket by 150% to over 300%, causing hundreds of millions of dollars in damages to the millions of diabetics in the United States who depend on insulin to survive.

3.      The culprit for the out-of-control prices is not a raw material shortage, a spike in production costs or any restrictive regulation. The insulin treatments are clinically unchanged since just a few years ago when they cost a fraction of what they do today.

4.      The cause is a callous, greed-inspired "rebate game" being played by the Drug Manufacturer Defendants at the behest of three secretive, giant corporations known as pharmacy benefit managers ("PBMs" or "PBM Defendants"):  Defendants Express Scripts, Inc. and Express Scripts Holding Company (collectively, "Express Scripts"), CVS Health Corp. ("CVS") and, OptumRx, Inc. The PBM Defendants and the Drug Manufacturer Defendants are collectively referred to as "Defendants."

5.      The PBM Defendants are middlemen between the health insurance companies and the drug manufacturers.  PBMs negotiate the price of brand named drugs[1] on behalf of insurers.  But for the drug manufacturers, the PBMs represent gatekeepers, as the PBMs dictate for the health insurers which of the over 180 million Americans enrolled in some type of health plan can buy a drug and how much that consumer will pay.

---

[1] "Brand named drugs" (also known as "branded drugs" or "brand drugs") are medicines still protected by a patent(s), as opposed to generic drugs, which are not.

6.     The PBMs maintain approved lists of drugs, called formularies.  For a drug manufacturer, if your drug is not on a PBMs' formulary, you are effectively cut off from millions of insured consumers who are enrolled in the health plans that engage that PBM.

7.     Each Defendant PBM enters a contract, typically on an annual basis, with each drug manufacturer.  The contracts set the payments that each Drug Manufacturer Defendant must make in order to get formulary placement and access to the market.  The contracts are non-public, secret agreements.  Defendants make a *quid pro quo*:  PBMs sell access to their formularies (and the corresponding millions of diabetes patients in covered health plans) by demanding that the drug manufacturers offer ***not the lowest price***, but the ***highest payment***, which they misleadingly call a "rebate" (the "Rebate Game").  The Drug Manufacturer Defendants have played the Rebate Game, winning formulary placement for their insulin drugs with offers of high rebates off of insulin list prices.  The Rebate Game has resulted in insulin list prices going through the roof.

8.     The size of the rebate payment to the PBM is a percentage of the insulin list price. The PBM receives the payment directly from the drug manufacturer, and keeps the entire rebate or passes a portion on to its health insurer client.

9.     As the Drug Manufacturer Defendants increase their list prices, the PBMs' rebate payment gets larger. As a hypothetical, where the PBM has awarded formulary placement to a type of insulin on a drug manufacturer's bid of a 60% rebate, and the list price of the insulin drug is $100, the rebate payment made by the drug manufacturer to the PBM is $60.  Of that, the PBM pockets, hypothetically, 10%, or $6. If the drug manufacturer raises list price to $200, the rebate payment increases to $120, and the PBM's 10% cut has now jumped to $12.

10.     Through mergers and acquisitions in the past five years, the PBM Defendants are three behemoths controlling access to 82% of covered lives in the United States.

11.     Plaintiffs and the proposed Class are uninsured insulin consumers and insured insulin consumers who have paid any portion of a prescription for Lantus, Levemir, Novolog and/or Humalog at a price calculated by reference to a list price or "benchmark" price such as Wholesale Acquisition Cost ("WAC") or Average Wholesale Price ("AWP").[2]

12.     Defendant Novo Nordisk recently acknowledged that certain types of insulin purchasers are injured by the Drug Manufacturer Defendants' dramatic increases to analog insulin list prices.  "Those exposed to list price include patients: without insurance; fulfilling coinsurance or deductible requirements; within the Medicare Part D coverage gap."

*Figure 1:*



_____

[2] WAC is the cost that the manufacturer invoices the wholesaler for the product. AWP is published list price. It is defined as WAC times a constant.

13.    This action alleges that the PBM Defendants and the Drug Manufacturer Defendants violated, and continue to violate, Section One and Three of the Sherman Antitrust Act by entering contracts that unlawfully restrain trade. The PBM-Drug Manufacturer agreements that provide for payments in exchange for formulary access have the effect of restricting output, allocating customer markets, and raising prices to supra-competitive levels for Plaintiffs and members of the proposed Class. The conduct is also alleged as against the Drug Manufacturer Defendants and PBM Defendants to violate various antitrust and state unfair trade practice and consumer protection laws. Plaintiffs also allege that Defendants violated and continue to violate, the Racketeer Influenced and Corrupt Organizations Act ("RICO").

## II.    PARTIES

### A.    Plaintiffs

14.    Plaintiff Frank Barnett is a citizen of New Mexico and resides in Albuquerque, New Mexico.

15.    Mr. Barnett has type 2 diabetes and is currently taking Lantus and Novolog. Mr. Barnett has been insured under Medicare Part D for three years and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% or more of his insulin drugs per month. During the time he purchased Lantus and Novolog from June to November 2016, he paid upwards of $400-$500 each month.

16.    Plaintiff Aletha Bentele is a citizen of Missouri and resides in Independence, Missouri.

17.    Mrs. Bentele is currently taking Humalog and Lantus for type 1 diabetes. She is insured by Blue Cross Blue Shield of Kansas City and Medicare Part D managed by Anthem Blue Cross Blue Shield. She has been insured under Medicare Part D for ten years and

consistently reaches the Medicare Part D "Donut Hole" where she must pay 40% or more of her insulin drugs.  During these periods, Ms. Bentele has paid upwards of $300-$400 for Humalog.

18.     Plaintiff Dianna Gilmore is a citizen of Utah and resides in Spanish Fork, Utah.

19.     Mrs. Gilmore has type 2 diabetes and is currently taking Novolog.  In the past, she has taken Lantus, Levemir, Humalog, and Novolog.  Mrs. Gilmore is uninsured and has paid for insulin medication out of pocket. Since November 2015, she has paid upwards of $295 for insulin, however, due to the high cost, Ms. Gilmore cannot afford insulin on a monthly basis and has been forced to ration her medication.

20.     Plaintiff Mark Goldsmith is a citizen of New York and resides in New York, New York.

21.     Mr. Goldsmith's minor daughter has type 1 diabetes. The Goldsmiths are insured by Aetna Health Insurance. Mr. Goldsmith's daughter is currently taking Lantus and Novolog. Mr. Goldsmith purchased Novolog and Lantus to treat his son's diabetes in March, June, and September of 2016.

22.     Plaintiff Ritch Hoard is a citizen of Michigan and resides in Atlanta, Michigan.

23.     Mr. Hoard has type 1 diabetes and is currently taking Lantus.  He has been insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay 40% or more of his insulin drugs per month.  Once he reaches his coverage gap, he has paid upwards of $400-$500 for each ninety day supply of Lantus.

24.     Plaintiff Tremayne Sirmons is a citizen of Florida and resides in Winter Park, Florida.

25.     Mr. Sirmons has type 1 diabetes and is currently taking Humalog and Levemir. Mr. Sirmons is insured under the UnitedHealthcare's Greensboro Small Group Policy. On

January 2, 2017, in order to reach his copay deductible, he paid $1,033.56 for Humalog and Levemir.  Now that he has reached his deductible, he pays $45.00 for Humalog and $15.00 for Levemir each month.

26.   Plaintiffs Barnett, Bentele, Gilmore, Goldsmith, Hoard, and Sirmons are collectively referred to as "Plaintiffs."

**B.    Defendants**

27.   Defendant Sanofi-Aventis U.S. LLC ("Sanofi") is a Delaware limited liability corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807.  Sanofi manufactures Lantus, which is used for the treatment of diabetes.

28.   Defendant Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation and has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  Novo Nordisk is one of the largest producers of insulin medications, including but not limited to Novolog and Levemir used for the treatment of diabetes.

29.   Defendant Eli Lilly and Company ("Eli Lilly") is a corporation organized and existing under the laws of the State of Indiana and has a principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. Eli Lilly manufactures Humalog, which is used for the treatment of diabetes.

30.   Defendant Express Scripts Holding Company is a Delaware corporation with its principal place of business located at One Express Way, St. Louis, Missouri, 63121.

31.   Defendant Express Scripts, Inc. is a Delaware corporation with its principal place of business located at One Express Way, St. Louis, Missouri, 63121.  Defendant Express Scripts Holding Company and Defendant Express Scripts, Inc. are collectively referred to as "Express Scripts."

32.     Express Scripts constitutes the largest PBM in the country. Annually, approximately 86 million individuals fill more than 1.4 billion prescriptions through Express Scripts. Express Scripts' operations include mail-order/home deliver and specialty pharmacies. In 2014 Express Scripts' annual revenue exceeded $100 billion, constituting approximately 50% of all revenues received by PBMs that year.

33.     Defendant CVS Health Corporation, formally known as CVS Caremark Corp. ("CVS"), is a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895. CVS is the nation's second largest PBM, managing the prescription benefits for over 2,000 health plans nationwide. CVS also operates a national retail pharmacy network with over 60,000 participating pharmacies as well as numerous specialty and mail-order pharmacies.

34.     Defendant UnitedHealth Group Inc. ("UnitedHealth") is a Delaware corporation based in Minnetonka, Minnesota.  UnitedHealth Group is the parent corporation for a large number of businesses within two basic market areas – health benefits and health services.  One of UnitedHealth's principal companies in the services market include OptumRx, Inc., a PBM.

35.     Defendant OptumRx, Inc. is a California corporation with its principal place of business located at 2300 Main Street, Irvine, California, 92614. OptumRx, Inc. is a wholly owned subsidiary of UnitedHealth Group Inc.  In or about July 2015, UnitedHealth, Inc. acquired another PBM, Catamaran Corp., and merged it with OptumRx, Inc.  At that time, OptumRx, Inc. was the third largest PBM and Catamaran was the fourth largest PBM in the country. With the acquisition of Catamaran, OptumRx, Inc. now controls prescriptions filled by more than 65 million patients nationwide. The merger grew the annual number of prescriptions filled through OptumRx, Inc. to approximately one billion per year. With the merger, OptumRx,

Inc. continues to be the nation's third largest PBM. OptumRx, Inc. and/or corporate affiliates owned by UnitedHealth Group, Inc. operate mail-order and specialty pharmacies. In 2014 OptumRx, Inc.'s annual revenues were approximately $32 billion and those of Catamaran were more than $21.5 billion.  Defendant UnitedHealth Group Inc. and Defendant OptumRx, Inc. are collectively referred to as "OptumRx."

### III.   JURISDICTION AND VENUE

36.      This Complaint is filed (i) against all Defendants under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to for injunctive relief, treble damages, costs, including reasonable attorneys' fees; (ii) against Defendants under state antitrust and consumer protection laws; and (iii) against all Defendants under Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 for the injuries Plaintiffs and members of the Class sustained by means of Defendants' misconduct.

37.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1337, and by the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

38.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because  Plaintiffs' claims arise under federal law, and under 18 U.S.C. § 1964(c) because this action  alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

39.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district  courts with original jurisdiction over civil actions in which the matter in controversy exceeds the  sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any  member of a class of Plaintiffs is a citizen of a state different from any Defendant.  Finally, this  Court has supplemental jurisdiction over Plaintiffs' state law claims

pursuant to 28 U.S.C. § 1367.

40.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965, because each Defendant transacts business in, is found in, and/or has agents in the District of New Jersey, and because some of the actions giving rise to the complaint took place within this district.  Venue is also proper in this District pursuant to the provisions of 15 U.S.C. § 22.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1367 and 1332.

41.     The Court has personal jurisdiction over each Defendant.  Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district.  The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

## IV.    DIABETES AND INSULIN

### A.    Diabetes and How Insulin Works

42.     Approximately 29 million Americans live with diabetes today—9.3% of the population. This number is likely to grow substantially in the immediate future, as 86 million Americans have prediabetes, a health condition that significantly increases a person's risk of a form of diabetes.

43.     Diabetes is a disease that occurs when a person has too much glucose—sugar—in their blood stream. The human body normally breaks down food into glucose, which serves as energy for cells without which cells do not function.  In this process, insulin is the catalyst to opening the cells and permitting glucose to enter. A lack of insulin or an inability to respond to

insulin means glucose is unable to enter the cells, which leads to high blood sugar levels. Unchecked, high blood sugar levels in a non-diabetic can lead to type 2 diabetes.

44.     There are two basic types of diabetes. Approximately 90–95% of Americans living with diabetes developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies produce. Known as "type 2," this more common form of diabetes is typically associated with increased body weight and lack of exercise, and is often developed later in life. In contrast, "type 1" diabetes occurs when a patient completely ceases insulin production. This form of diabetes is usually diagnosed in children and young adults, but can occur at any age.  People with type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die.

45.     When first diagnosed, many type 2 patients can initially be treated with tablets that help their bodies either secrete more insulin or better respond to the insulin they already produce. Nonetheless, these tablets are often insufficient for patients in the long term. To adequately control their blood sugar levels, many type 2 patients must inject insulin to supplement that which their bodies produce. About a quarter of type 2 patients rely on insulin treatment. In contrast to type 2 patients, a person living with type 1 diabetes must rely on insulin treatments for their entire lifetime.

46.     If left untreated or under-treated, diabetes can be debilitating and deadly. Diabetes is the seventh-leading cause of death in the United States, and even when it is not fatal it carries heightened risks of heart disease, stroke, kidney disease and blindness.

**B.     The Origins of Insulin Treatment**

47.     Treatment for diabetes has been available for almost a century.  In 1922, the discovery of how to extract insulin for patient treatment was made by a young orthopedic

surgeon without laboratory training, Frederick Banting, and his medical-student assistant, Charles Best. Banting and Best had discovered the hormone insulin a year before in 1921. They were the first to remove active insulin from the pancreas of cows and pigs that could then be used to treat human patients with diabetes—a type of insulin treatment that came to be known as "beef and pork insulin." Prior to this innovation, diabetes was almost always a death sentence.

48.     Banting and Best wanted their discovery to be open to the public, available to all. They eventually obtained a patent to ensure that no one else would, and thereby obtain exclusive rights and potentially restrict supply. Banting and Best sold their patent rights to the University of Toronto for only $1 each.

49.     Ultimately, in order to scale up production, the University of Toronto teamed up with Eli Lilly, an established pharmaceutical company. Under this arrangement, Eli Lilly was allowed to apply for U.S. patents on any improvements to the manufacturing process. The University of Toronto also licensed the rights to produce insulin to a few other companies, including Denmark's Nordisk Insulinlaboratorium and Novo Terapeutisk Laboratorium. Those initial licenses laid the groundwork for Eli Lilly and Novo Nordisk's future domination of the insulin market.

50.     The original animal insulin isolated by the University of Toronto researchers was "short acting," so-called because it had an effect on patient blood sugar levels for three to six hours. In the early 1930s, scientists at Nordisk discovered that the addition of a certain protein to insulin altered its absorption into the blood stream, prolonging its effect. This form of insulin became known as long-acting. Subsequent innovations in the 1940s made it possible to

combine long-acting and short-acting insulin. This advance allowed many diabetes patients to take a single daily injection.

51. A drawback of beef-and-pork insulin is that, although similar to human insulin hormone, their composition differs slightly. Consequently, a number of patients' immune systems produce antibodies against it, neutralizing its actions and resulting in painful inflammation at injection sites.

52. When the "beef and pork" insulin patents began to expire in the late 1970s, scientists began to produce human insulin through recombinant DNA technology. This involves synthesising *humulin* by inserting the insulin gene into the E. coli bacterial cell, to produce insulin that is chemically identical to its naturally produced counterpart. Recombinant DNA technology is a more reliable and effective way to scale up the manufacture of insulin, and does not have the medical drawbacks of "beef and pork" insulin.

53. By 1982, Eli Lilly brought the first "recombinant human insulin" to the U.S. market. Around the same time, Novo and Nordisk likewise developed a recombinant insulin. Eli Lilly and the now merged Novo Nordisk obtained new insulin patents that would persist into the 21st century.

54. In the mid-1990s, researchers began to improve the way human insulin works in the body by changing its DNA sequence and creating a man-made "analog," a chemical substance that mimics another substance well enough that it fools the cell.

55. By 1996 Eli Lilly had obtained approval for Humalog, the first rapid-acting, analog insulin. It allowed for substantially faster absorption times. Novo Nordisk released its own rapid-acting analog, Novolog, in 2000. Four years after that, a third pharmaceutical company, Sanofi, released another rapid-acting analog, Apidra.

56.     In 2000, Sanofi released the first long-acting analog. This drug was branded as Lantus. Five years later, Novo Nordisk gained approval for its own long-acting analog, Levemir. The first patents on these long-acting analogs expired in June 2014.

| Table 1: Certain Analog Insulin Available in the United States | | | | | |
|---|---|---|---|---|---|
| *Insulin Type* | *Action* | *Brand Name* | *Generic Name* | *Manufacturer* | *Released* |
| **Analogs** | Long-Acting | Levemir | Detemir | Novo Nordisk | 2006 |
| | | Lantus | Glargine | Sanofi | 2001 |
| | Rapid-Acting | Humalog | Lispro | Eli Lilly | 1996 |
| | | Novolog | Aspart | Novo Nordisk | 2001 |
| | | Apidra | Glulisine | Sanofi | 2006 |

### C.     Analog Insulins Dominate

57.     Today, analogs dominate the insulin market. Doctors and patients prefer analogs because they more closely mimic the way the human body naturally absorbs insulin released by the pancreas. As a result, analogs can be used in more flexible ways.

58.     The American Diabetes Association (the "ADA")—the organization responsible for setting guidelines for diabetes care in the United States—recommends analogs for treatment of individuals with both type 1 and type 2 diabetes.

59.     For type 1 patients, insulin analogs are unquestionably the best course of treatment. Doctors uniformly prescribe analogs for type 1 patients.

60.     For patients with type 2 diabetes, the ADA describes long-acting analog insulin as the most convenient initial insulin regimen. Likewise, doctors prefer to prescribe analog insulins to type 2 patients. As of 2010, among adults who filled more than one prescription for insulin, 91.5% filled prescriptions for insulin analogs.  Type 2 patients use human insulin less frequently: only 18.9% of type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000. In the wake of analog insulin, human insulin, like Novolin or Humilin, has nearly become obsolete.

61. In 2016 the top three selling insulins in the United States were all analogs: Sanofi's long-acting Lantus garnered $6.98 billion in sales; Novo Nordisk's long-acting Novolog: $3.03 billion; and Eli Lilly's rapid-acting Humalog: $2.84 billion.

**D.    Analog insulins are fungible**

62. Long-acting analog insulins, Lantus and Levemir, are fungible, economic substitutes. They are generally approved as therapeutically interchangeable. The same is true for rapid-acting insulins (so-called "meal-time insulins") Novolog and Humalog. Studies show that there is no meaningful difference in the effectiveness of Levemir versus Lantus or Humalog versus Novolog. The FDA has stated that in certain circumstances, one brand of rapid-acting insulins may be substituted for another brand of rapid-acting insulins; and that one brand of long-acting insulins may be substituted for another brand of long-acting insulins.

63. Consequently, notwithstanding health insurance coverage, a diabetes patient can switch insulin brands, even as doing so can be disruptive and inconvenient due to the potential need to titrate the proper dosage when switching brands.  In most states, a new prescription is not legally required to switch insulin brands, only approval from a medical health professional, which includes doctors and nurses.

64. As alleged in further detail below, in the last few years prices for analog insulins have skyrocketed. Some prices have increased 172%, from $144.84 to $248.51, in about one and a half years' time. These extremely high prices are unique to the United States. Indeed, many of these exact same insulins are sold in Canada for less than 25% of the U.S. price. However, U.S. law prevents U.S. patients from importing drugs from outside the U.S., insulating the U.S. market.

## V.     MARKETPLACE ACTORS INVOLVED IN DRUG PRICING AND DISTRIBUTION

65.     The entities involved in drug pricing and distribution for brand name drugs include pharmaceutical companies, wholesalers, pharmacies, health insurers, and PBMs.

66.     ***Pharmaceutical Companies***. Pharmaceutical companies, a.k.a. "drug manufacturers," own the rights to manufacture and market drugs. Pharmaceutical companies usually manufacture drugs and sell them to drug wholesalers.  The drug manufacturers sell brand name drugs, such as insulin, to the major drug wholesalers at a price tied to a benchmark price.[3] Defendants Eli Lilly, Novo Nordisk and Sanofi are pharmaceutical companies.

67.     ***Wholesalers***.  Drug wholesalers purchase bulk quantities of drugs directly from drug manufacturers and then distribute them to pharmacies and hospitals.  For example, a wholesaler may fill an order from a pharmacy for a specified quantity of drugs produced by one or more manufacturers and deliver the order to the pharmacy. Three wholesalers—AmerisourceBergen Corporation, Cardinal Health Inc. and McKesson Corporation—account for over 85% of all drug distribution in the United States.

68.     The three major drug wholesalers sell to retail pharmacies, hospitals and other dispensers at a price markup, usually tied to WAC.

69.     ***Pharmacies***. Pharmacies typically purchase pharmaceuticals from wholesalers, then dispense the products to patients. Pharmacies dispense drugs in several types of settings, including a retail pharmacies, mail orders, hospitals, long-term care facilities and others.

70.     ***Health Insurers***. Health insurers submit payments on behalf of insured individuals to pharmacies and other drug dispensers for services rendered to the insured

---

[3] Throughout the complaint a "benchmark," "benchmark price" or "list price" includes public and non-public drug price references which include, but are not limited to WAC and AWP.

individuals. Health insurers cover a portion of their members' drugs costs, submitting reimbursement payments, to pharmacies on behalf of their members. The term "health insurers" here covers health plan sponsors such as self-insured businesses, insurance companies, (including those that participate in Medicaid and Medicare), and union-run health plans.

71.     Commercial and non-commercial health insurers, together with PBMs, are frequently referred to as "payers."

72.     ***Pharmacy Benefit Managers ("PBMs")***. PBMs are middlemen between drug manufacturers and health insurers. PBMs perform services on behalf of their health insurer clients, including the negotiation of drug prices with drug companies, creation of formularies, management of prescription billing, assembly of retail pharmacy networks for insurers, and provision of mail-order services. The largest PBMs are Express Scripts, CVS, and UnitedHealth Group's OptumRx.  A wave of consolidation since 2012 has drastically concentrated market power in the hands of these "Big Three" PBMs, which together negotiate drug pricing on behalf of health plans that enroll 82% of all insureds, or "covered lives."

73.      On the heels of the consolidation of the PBM industry into the hands of Express Scripts, CVS, and OptumRx, PBMs have become increasingly powerful gatekeepers that stand between drug manufacturers and the market of tens of millions of health plan enrollees.

74.     PBMs' manage their health insurer client's prescription benefits by creating and/or managing ***formularies.*** A formulary lists the drugs that are covered under a health insurance plan.  Most formularies have multiple tiers of coverage. The tier in which a drug is placed determines the level of coverage the health insurer gives to the drug. Plan members typically pay less out-of-pocket for drugs in preferred formulary tiers. If a drug is not listed on the formulary, most health insurers will not cover it at all.

75.     PBMs use formularies to push patients toward certain brands of drugs over others. PBMs also use a tactic called "Step Therapy" to reinforce their formulary. Step Therapy requires that lower cost medications, normally generics, be used to treat a disease state before a more expensive branded product is approved for payment. Another tactic is called "Prior Approval." Prior Approval requires that the physician or pharmacy contact the PBM before the product can be covered, therefore slowing down the process and discouraging the utilization of the product. Both Step Therapy and Prior Authorization can be bypassed for manufacturers receiving preferred formulary positions. Ostensibly, the formulary should favor the safest and most effective drugs for the price, while disfavoring more expensive drugs or those with lower safety and efficacy profiles.

76.     Drug manufacturers desire favorable placement on formularies. Without favorable placement, a drug manufacturer is excluded from access to tens of millions of consumers enrolled in the health plans for which drug coverage is controlled by those PBMs. In return for granting access to a PBM's vast network of health plan enrollees, PBMs negotiate with drug manufacturers to obtain rebates off of drugs' list prices.

77.     Utilizing "exclusionary formularies" is a PBM tactic that has become prevalent in recent years. This occurs when multiple drugs are therapeutically interchangeable and the PBM excludes all but one of the drugs from the formulary. Health insurers will not reimburse their members for those drugs excluded from the formulary. Consequently the large PBMs, by employing these so-called "exclusionary formularies," have the ability to pick one drug (and its corresponding manufacturer) as the "winner" for all of the insureds governed by the formulary within a specific network.

## VI.    CHAIN OF DISTRIBUTION

78.    Drugs such as insulin have a straightforward chain of distribution between drug manufacturer and the ultimate patient-consumer:   (i) The drug manufacturer sells to a wholesaler; (ii) the wholesaler sells the drug to a pharmacy or other drug dispenser; and (iii) the pharmacy (or other dispenser) dispenses the drug to the patient-consumer.

*Figure 2:*



## VII.    RISING DRUG LIST PRICES HURT CONSUMERS

79.    The prices for the drugs distributed in the pharmaceutical supply chains are different for each participating entity. That is, different entities pay different prices for the same drugs. In the end, consumers who pay out-of-pocket for some or all of a drug are the ones hurt when a drug's list price rises.

80.    Only a drug's AWP is reported. A related benchmark price, the WAC is similar to AWP. The WAC and AWP benchmark prices, or "list prices," are tied together.

81.      Wholesalers use their bulk purchasing power to negotiate lower drug prices from the drug manufacturers.  However, the price at which drug manufacturers sell brand name drugs to wholesalers is tied to a benchmark, such as WAC.

82.      Wholesalers sell to retail pharmacies at a different price, but it is almost always at a markup tied to a benchmark price.

83.      Large retail pharmacies that purchase in large quantities are often able to negotiate lower drug prices from wholesalers. Even small, independent pharmacies can receive quantity-based discounts by participating in pharmacy buying groups which leverage the purchasing power of smaller pharmacies by negotiating on behalf many pharmacies at once.

84.      Health insurers pay much lower prices than the benchmarks. PBMs negotiate contracts with drug manufacturers that provide that the drug manufacturer will make payments to the PBM in exchange for formulary placement.  They call the payments "rebates" and set the payment amount as a percentage of the list price.  PBMs may pass on to their health insurer clients a portion of the rebate payments that they extract from drug manufacturers.

85.       Frequently, PBM contracts with drug manufacturers contain a price protection term for the payer. The term requires rebate amounts to rise in response to price increases so that the payer does not pay higher net prices for drugs.

86.      In the end, the ones who actually pay the full drug benchmark prices are consumers who are uninsured or insured but paying for drugs out-of-pocket before they hit their deductibles. Rising benchmark prices also harm patients who pay a percentage based copay ("coinsurance") or reach the Medicare Part D "Donut Hole,"[4] because these consumers' payments are tied to the drugs' benchmarks prices. As benchmark prices rise, so too do consumer payments.

---

[4] The "Donut Hole" is a gap in Medicare Part D insurance coverage. It is discussed in further detail below.

## VII.    DRUG COSTS FOR CONSUMERS

### A.    Uninsured

87.    The cash-paying, uninsured customer[5] typically must pay the full benchmark price  when he or she picks up the prescription at the pharmacy. Even with the Affordable Care Act affording access to health insurance where previously it was impeded, and its expansion of Medicaid coverage in those states that accepted it, roughly 28.5 million Americans remained uninsured in 2015.

### B.    High Deductible Plans, Coinsurance And Copay Requirements

88.    Despite their monthly insurance premiums, insured consumers often still pay all or a part of drug benchmark prices. Out-pocket-costs for insured consumers come in three forms: deductibles, coinsurance requirements, and/or copayment requirements

89.    *High Deductible Plans*. The term "deductible" refers to a set amount of healthcare cost an insured must pay for by herself (out-of-pocket) before her plan will begin to contribute to her healthcare costs. Once a patient reaches her deductible, her health plan begins to contribute, paying a portion of her healthcare costs. Although most health plans have some form of a deductible, high-deductible health plans are aptly named for their larger-than-average deductibles. Insured individuals in high-deductible plans must usually pay full benchmark prices until they hit their deductibles.

90.    Enrollment in high-deductible health plans is on the rise. Since 2010, the percentage of covered workers enrolled in high-deductible health plans has increased nearly threefold, with 29% now enrolled in high-deductible plans.

---

[5] For the purposes of this complaint, the term "uninsured customer" refers to a patient-customer making a "cash purchase" (also known as a "cash payment") of a pharmaceutical product. A cash purchase occurs when a patient-customer purchases a drug without any health insurer assistance or other type of involvement (100% out-of-pocket), whether the customer is not enrolled in a health plan or is enrolled in a health plan but chose to make the purchase without health plan involvement.

**Figure 3: Percentage of Covered Workers Enrolled in High-Deductible**

**Health Plans from 2006-2012**



*Estimate is statistically different from estimate for the previous year shown (p<.05).

NOTE: Covered Workers enrolled in an HDHP/SO are enrolled in either an HDHP/HRA or a HSA-Qualified HDHP. For more information see the Survey Methodology Section. The percentages of covered workers enrolled in an HDHP/SO may not equal the sum of HDHP/HRA and HSA-Qualified HDHP enrollment estimates due to rounding.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.

91.    Deductibles themselves have risen. The average annual deductible for an individual enrolled in a high-deductible plan is now between $2,031 and $2,295, depending on the exact type of plan. The average annual deductible for family coverage is now between $4,321 and $4,364, again, depending on the type of plan.

92.    The average deductibles for plans available under the Affordable Care Act on the Marketplace Exchanges are also high. The Marketplace health plans are broken into tiers: bronze, silver, gold, and platinum. The cheapest plans—bronze and silver—come with very high deductibles. In 2016, the average deductible in such plans were $5,765 for bronze plans (up from $5,328 in 2015) and $3,064 for silver plans (up from $2,556 in 2015).

93.     Many individuals and families cannot afford to hit their high-deductible costs year after year. As a result, rising drug benchmark prices are particularly harmful to patients in high deductible plans.

94.     Some plans have a lifetime maximum benefit that includes all aspects of health care. Once this amount has been reached, all benefits cease. This can be devastating to a member with a serious chronic disease. Increasingly high prescription costs can accelerate the member reaching the maximum threshold.

95.     ***Coinsurance and Copayments***. In addition to their deductibles, individuals with insurance must usually make copayments[6] or coinsurance payments for the healthcare services they need. A copayment is a fixed fee that an individual must pay for a healthcare service at the time of care. For drugs, copayments are fixed fees that consumers pay when they pick up their prescriptions. Copayment rates vary depending on the drug; drugs in preferred formulary positions have lower copays, and drugs in disfavored formulary positions require larger copays.

96.     Coinsurance[7] is similar. However, instead of paying a fixed fee for a particular service, individuals with coinsurance arrangements must pay a fixed *percentage* of the cost of the healthcare service provided. For drugs, this means a percentage of the drug's benchmark price. This percentage varies depending on the drug, with lower coinsurance rates for preferred drugs, and higher coinsurance rates for disfavored drugs.

97.     For those who must pay full benchmark prices until they hit their deductibles, copayments and coinsurance obligations begin after they reach their deductibles. Plans that cover prescription drugs right away, not requiring patients to reach their deductibles first, require copayments or coinsurance contributions for every drug purchase.

---

[6] Also known as "copay."
[7] Also called a percentage based copay.

98.     For covered workers enrolled in health plans with three or more tiers of cost sharing for prescription drugs, average coinsurance rates are 17% for first-tier drugs, 25% for second-tier drugs, 37% for third-tier drugs, and 29% for fourth-tier drugs. Lantus, Levemir, Humalog, and Novolog are still branded drugs. Therefore, insurance plans generally classify them as second or third-tier drugs on their formularies. As a result, coinsurance payments for these drugs can be a heavy financial burden.

### C.     Medicare Part D

99.     Patients in Medicare's prescription drug program, called "Medicare Part D," often pay a large portion of their drugs' benchmark prices. In 2017, the Medicare Part D standard prescription drug plan will have a $400 deductible and a 25% coinsurance obligation up to an initial coverage limit of $3,700. Once Medicare Part D patients meet this $3,700 limit, they fall into the coverage gap, more commonly known as the "Donut Hole." In the Donut Hole, patients must pay 40% of their brand-name drugs' benchmark prices. Only once patients total out-of-pocket spending reaches $4,950 will Medicare begin to shoulder 80% of their healthcare costs again. Figure 4 demonstrates patient cost-sharing in the standard Medicare Part D plan for 2017.



*Figure 4:*

NOTE: Some amounts rounded to nearest dollar. [1]Amount corresponds to the estimated catastrophic coverage limit for non-low-income subsidy (LIS) enrollees ($7,425 for LIS enrollees), which corresponds to True Out-of-Pocket (TrOOP) spending of $4,950, the amount used to determine when an enrollee reaches the catastrophic coverage threshold in 2017.
SOURCE: Kaiser Family Foundation illustration of standard Medicare drug benefit for 2017.



100.     This complex price system leads to patient consumers paying drastically higher prices for insulin than their insurers (if they have insurance). If a patient is responsible for all of her drugs costs before she hits her deductible, she must pay the *benchmark price* until she meets her deductible; if she pays coinsurance, she pays for a percentage of the drug's *benchmark price*; if she is in a Medicare Part D plan and reaches the Donut Hole, she must pay 40% of her brand-name drugs' benchmark prices.

## VIII.   THE LOCKSTEP INCREASES TO INSULIN BENCHMARK PRICES

101.     The average diabetes patient needs one vial of insulin per month, although many need much more.  The top-selling analog insulin, Sanofi's long-acting Lantus, costs $250 per

vial, up from approximately $115 in 2011.  Novo Nordisk's competing Levimir costs $280 per vial, up from about $90 in 2011.

102.    Eli Lilly has doubled the price of its rapid-acting analog insulin, Humalog, since 2011, now charging $255 per vial.  Not to be outdone, Novo Nordisk has more than doubled its price of the competing Novolog, $250 a vial, up from $100 in 2011.

103.    These skyrocketing prices are not caused by any rise in the cost of manufacturing the analog insulin drugs.  They are the same drugs they were five years ago, but well over double the price.

104.    When a drug manufacturer wishes to raise the price of a brand name drug, they typically send a letter or notification to drug wholesalers notifying them that a new, higher price is effective immediately. Plaintiffs have obtained the underlying data from some of these notifications regarding Lantus and Levemir sent between April 2013 and November 2014, and Humalog and Novolog sent between September 2013 and September 2016 (the "WAC Data"). The WAC Data reveal lockstep price increases on analog insulin drugs carried out by Eli Lilly, Novo Nordisk and Sanofi.  Lantus and Levemir WAC prices rose 170% between April 2013 and November 2014, while Humalog and Novolog prices shot up 167% between July 2013 and July 2016.

### A.    Long-Acting Insulin WAC Hikes

105.    The WAC Data on Lantus and Levemir, the two long-acting insulin products produced by Defendants, depict a pattern of WAC matching-behavior. Sanofi raises the Lantus WACs about 9-16%, and then, a day to a few weeks later, Novo Nordisk sets Levemir WACs to match, sometimes down to the penny

106.    Between April 2013 and November 2014 Sanofi produced three Lantus products: a solution, a 15-pack of pens, and a 3-pack of pens. Throughout the same period, Novo Nordisk produced two Levemir products: a solution and a 15-pack of pens. Novo Nordisk also released a Levermir pen in May 2014. Since many of these insulin products are sold in different sizes, the WAC values here are WACs per-100ml.

107.    The coordinated WAC hikes by Sanofi (Lantus) and Novo Nordisk (Levemir) are shown in the graph below and in the following in Table 2 and Figure 5.

*Figure 5:*



| Table 2: Long-Acting Insulin Product | Date of Increase | % of Increase | New WAC/100ml |
|---|---|---|---|
| Lantus SoloStar 100units/ml Pre-Filled Pen Solution for Injection ("Lantus Pen") | 4/26/13 | 9.9% | $167.25 |
| Lantus 100units/ml Solution for Injection ("Lantus Solution") | 4/26/13 | 9.9% | $144.84 |
| Levemir 100units/ml Solution for Injection ("Levemir Solution") | 5/3/13 | 9.89% | $148.49 |
| Lantus Pen | 8/2/13 | 9.9% | $183.81 |
| Lantus Solution | 8/2/13 | 14.89% | $166.42 |
| Levemir Solution | 8/27/13 | 12.07% | $166.42 |
| Lantus Pen | 12/13/13 | 9.94% | $202.08 |
| Lantus Solution | 12/13/13 | 14.93% | $191.28 |

| | | | |
|---|---|---|---|
| Levemir Solution | 12/19/13 | 14.93% | $191.28 |
| Levemir FlexTouch 100units/ml Solution for Injection (15-pack)[8] ("Levemir Pen") | 5/21/14 | N/A | $202.08 |
| Lantus Pen | 5/30/14 | 9.89% | $222.08 |
| Lantus Solution | 5/30/14 | 16.1% | $222.08 |
| Levemir Pen | 5/31/14 | 16.1% | $222.08 |
| Levemir Solution | 5/31/14 | 9.89% | $222.08 |
| Lantus Pen | 11/7/14 | 11.89% | $248.51 |
| Lantus Solution | 11/7/14 | 11.9% | $248.51 |
| Levemir Pen | 11/18/14 | 11.9% | $248.51 |
| Levemir Solution | 11/18/14 | 11.89% | $248.51 |

**B.    Rapid-Acting Insulin WAC Hikes**

108.    The WAC Data on Humalog and Novolog, the two rapid-acting insulin products produced by Defendants Eli Lilly and Novo Nordisk, respectively, likewise depict a pattern of lockstep price increases.  The pattern shows Novo Nordisk raising the Novolog WACs about 6-10%, then, about one week later, Eli Lilly mimics that price hike for its Humalog, usually within a single dollar.

109.    Rapid-acting insulin is sold in several different forms: solutions, suspensions, cartridges/penfils, and pens. Defendants produced a version of Humalog and Novolog in each category. Between July 2013 and July 2016 Eli Lilly produced thirteen Humalog products of different sizes: two solutions, two cartridges, two suspensions, and seven pens. Throughout the same period Novo Nordisk produced five Novolog products of different sizes: a solution, a penfil,[9] a suspension, and two pens.

---

[8] The Levemir FlexTouch pens was released on 5/21/14 at the same WAC as the Lantus SoloStar pens.
[9] Equivalent to the Humalog cartridge solutions.

110.    Since many of these insulin products are sold in different sizes, the WAC values are WACs per 100ml.  Despite that fact Novo Nordisk and Eli Lilly sold Novolog and Humalog in four different rapid-acting insulin delivery systems and various sizes, they managed lockstep price increases.

*Figure 6:*



| Table 3: Rapid-Acting Insulin Solution Product | Date of Increase | % of Increase | New WAC/100ml |
|---|---|---|---|
| Novolog 100unit/ml Solution for Injection (10 pack)("Novolog Solution") | 7/19/13 | 7.99% | $153.00 |
| Humalog 100unit/ml Solution for Injection 10ml (3 & 10 packs) ("Humalog Solution" | 7/26/13 | 8.9% | $152.90 |
| Novolog Solution | 12/3/13 | 9.9% | $168.15 |
| Humalog Solution | 12/12/13 | 9.67% | $167.70 |
| Novolog Solution | 5/28/14 | 9.93% | $184.85 |
| Humalog Solution | 6/5/14 | 9.89% | $184.30 |
| Novolog Solution | 11/18/14 | 9.94% | $203.24 |
| Humalog Solution | 11/25/14 | 9.92% | $202.60 |
| Novolog Solution | 5/19/15 | 9.94% | $223.45 |
| Humalog Solution | 5/29/15 | 9.92% | $222.70 |
| Novolog Solution | 11/25/15 | 5.92% | $236.70 |
| Humalog Solution | 12/1/15 | 6.42% | $237.00 |
| Novolog Solution | 7/6/16 | 7.9% | $255.40 |
| Humalog Solution | 7/13/16 | 7.51% | $254.80 |

*Figure 7:*



| Table 4: Rapid-Acting Suspension Insulin Products | Date of Increase | % of Increase | New WAC/100ml |
|---|---|---|---|
| Novolog Mix 70/30 100unit/ml Suspension for Injection (10 pack) ("Novolog Suspension") | 7/19/13 | 8% | $158.72 |
| Humalog Mix 75/25 & 50/50 Suspensions for Injection 10ml (10 packs) ("Humalog Suspension") | 7/26/13 | 9.93% | $154.35 |
| Novolog Suspension | 12/3/13 | 9.9% | $174.44 |
| Humalog Suspension | 12/12/13 | 12.56% | $173.75 |
| Novolog Suspension | 5/28/14 | 9.92% | $191.75 |
| Humalog Suspension | 6/5/14 | 9.92% | $191.00 |
| Novolog Suspension | 11/18/14 | 9.94% | $210.82 |
| Humalog Suspension | 11/25/14 | 9.94% | $209.99 |
| Novolog Suspension | 5/19/15 | 9.92% | $231.75 |
| Humalog Suspension | 5/29/15 | 9.90% | $230.80 |
| Novolog Suspension | 11/25/15 | 5.93% | $245.50 |
| Humalog Suspension | 12/1/15 | 6.41% | $245.60 |
| Novolog Suspension | 7/6/16 | 7.9% | $264.90 |
| Humalog Suspension | 7/13/16 | 7.53% | $264.10 |

*Figure 8:*



| Table 5: Rapid-Acting Penfil/Cartridge Insulin Products | Date of Increase | % of Increase | New WAC/100ml |
|---|---|---|---|
| Novolog Penfill 100unit/ml Solution for Injection (15-pack)("Novolog Penfill") | 7/19/13 | 7.99% | $189.48 |
| Humalog 100unit/ml Cartridge Solution for Injection (3 & 10 packs) ("Humalog Cartridge") | 7/26/13 | 8.89% | $189.40 |
| Novolog Penfill | 12/3/13 | 9.9% | $208.24 |
| Humalog Cartridge | 12/12/13 | 9.73% | $207.83 |
| Novolog Penfill | 5/28/14 | 9.93% | $228.93 |
| Humalog Cartridge | 6/5/14 | 9.89% | $228.40 |
| Novolog Penfill | 11/18/14 | 9.94% | $251.71 |
| Humalog Cartridge " | 11/25/14 | 9.93% | $251.10 |
| Novolog Penfill | 5/19/15 | 9.94% | $276.73 |
| Humalog Cartridge | 5/29/15 | 9.91% | $276.00 |
| Novolog Penfill | 11/25/15 | 5.9% | $293.07 |
| Humalog Cartridge | 12/1/15 | 6.37% | $293.60 |
| Novolog Penfill | 7/6/16 | 7.91% | $316.27 |
| Humalog Cartridge | 7/13/16 | 7.51% | $315.67 |

*Figure 9:*



| Table 6: Rapid-Acting Pen Insulin Products | Date of Increase | % of Increase | New WAC/100ml |
|---|---|---|---|
| Novolog Mix Flexpen Prefilled Syringe 70/30s & 100s 100unit/ml Suspension for Injection (15 & 10 packs) ("Novolog Pen") | 7/19/13 | 7.99% | $197.02 |
| Humalog KwikPen Mix 75/25, 50/50, & 100 unit (3-packs & 15-packs) ("Humalog Pen") | 7/26/13 | 8.94% | $196.90 |
| Novolog Pen | 12/3/13 | 9.9% | $216.53 |
| Humalog Pen | 12/12/13 | 9.68% | $215.97 |
| Novolog Pen | 5/28/14 | 9.94% | $238.07 |
| Humalog Pen | 6/5/14 | 9.92% | $237.40 |
| Novolog Pen | 11/18/14 | 9.94% | $261.75 |
| Humalog Pen | 11/25/14 | 9.94% | $261.00 |
| Novolog Pen | 5/19/15 | 9.92% | $287.73 |
| Humalog Pen | 5/29/15 | 9.88% | $286.80 |
| Humalog KwikPen 200unit/ml Pre-Filled Pen Solution for Injection (6 pack) | 7/20/15 | n/a | $286.80 |
| Novolog Pen | 11/25/15 | 5.9% | $304.73 |
| Humalog Pen | 12/1/15 | 6.38% | $305.10 |
| Novolog Pen | 7/6/16 | 7.9% | $328.83 |
| Humalog Pen | 7/13/16 | 7.5% | $328.00 |

## VIII.   THE "REBATE" GAME

111.   The astronomical increase in the cost of vital analog insulin drugs Lantus, Levimir, Novolog and Humalog is caused by unlawful restraints of trade between the Drug Manufacturer Defendants and the PBM Defendants.

### A.   PBMs Demand and Receive Payment From Insulin Manufacturers In Exchange For Customer Allocation

112.   PBMs periodically revisit and reconstitute their drug formularies, including for insulin.  Typically, on a one to three year basis, the Defendant PBMs request proposals from the Drug Manufacturer Defendants to make non-public, secret bids for drug pricing.  Each drug manufacturer wants the PBM to put its drugs on the PBMs' various formularies, preferably in favorable tiers.  This should be a recipe for price competition between analog insulins, which within the long-acting and rapid-acting classes are therapeutically equivalent and fungible.  A PBM could, for example, reward the insulin within each class that is offered at the actual lowest price with the better formulary placement.  This is what competition would look like, and would contain drug costs for insurers and benefit diabetes patients by increasing accessibility to insulin at lower, competitive prices.

113.   Instead, the PBM Defendants and the Drug Manufacturer Defendants have played the Rebate Game. In a naked *quid pro quo*, PBMs sell access to their formularies (and the corresponding millions of diabetes patients in covered health plans) by demanding that the drug manufacturers offer not the lowest price, but the highest "rebate."  The insulin manufacturers have played the Rebate Game, winning formulary placement with offers of high rebates on insulin list prices, and raising the insulin list prices through the roof.

114.   Through mergers and acquisitions in the past five years, the PBM Defendants are three behemoths controlling access to 82% of covered lives in the United States.  Combined

with their new tactic of employing "exclusionary formularies," which coincidentally began five years ago, the PBM Defendants' market power enables them to extract large payoffs, akin to bribes, for formulary access.

115.   Since the beginning of 2013, for example, Eli Lilly has paid ever-increasing rebates to PBMs in order for its Humalog to be included on formularies.



116.   The PBM is interested in the size of the rebate payment, which is a percentage of the insulin list price. The PBM receives the payment directly from the drug manufacturer, and keeps the entire rebate or passes a portion on to its health insurer client.

117.   As the Drug Manufacturer Defendants increase their list prices, the PBMs' rebate payment gets larger. As a hypothetical, where the PBM has awarded formulary placement to a type of insulin on a drug manufacturer's bid of a 60% rebate, and the list price of the insulin drug is $100, the rebate payment made by the drug manufacturer to the PBM is $60. Of that, the PBM pockets, hypothetically, 10%, or $6. If the drug manufacturer raises list price to $200, the rebate payment increases to $120, and the PBM's 10% cut has now jumped to $12.

118.   CVS was the first PBM to make its formulary "exclusionary" for insulin when, in 2012, it awarded formulary placement to Novo Nordisk's rapid-acting analog insulin,

Novolog. CVS excluded Eli Lilly's Humalog. The next year, Express Scripts awarded formulary placement to only one rapid-acting analog, Eli Lilly's Humalog, and excluded Novo Nordisk's Novolog and Sanofi's Apidra.

**Table 7:**

| Express Scripts | | | | | | |
|---|---|---|---|---|---|---|
| **Analog Insulin** | **Brand** | **2013** | **2014** | **2015** | **2016** | **2017** |
| Long-acting | Levemir (Novo Nordisk) | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Lantus (Sanofi-Aventis) | ✓ | ✓ | ✓ | ✓ | ✓ |
| Rapid-acting | Humalog (Eli Lilly) | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Novolog (Novo Nordisk) | ✓ | **Excluded** | **Excluded** | **Excluded** | **Excluded** |
| | Apidra (Sanofi-Aventis) | ✓ | **Excluded** | **Excluded** | **Excluded** | **Excluded** |

**Table 8:**

| CVS | | | | | | |
|---|---|---|---|---|---|---|
| **Analog Insulin** | **Brand** | **2013** | **2014** | **2015** | **2016** | **2017** |
| Long-acting | Levemir (Novo Nordisk) | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Lantus (Sanofi-Aventis) | ✓ | ✓ | ✓ | ✓ | **Excluded** |
| Rapid-acting | Humalog (Eli Lilly) | **Excluded** | **Excluded** | **Excluded** | **Excluded** | **Excluded** |
| | Novolog (Novo Nordisk) | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Apidra (Sanofi-Aventis) | ✓ | ✓ | **Excluded** | **Excluded** | ✓ |

*Table 9:*

| OptumRx | | | | | | |
|---|---|---|---|---|---|---|
| **Analog Insulin** | **Brand** | **2013** | **2014** | **2015** | **2016** | **2017** |
| Long-acting | Levemir (Novo Nordisk) | ✓ | ✓ | ✓ | Excluded | Excluded |
| | Lantus (Sanofi-Aventis) | ✓ | ✓ | ✓ | ✓ | ✓ |
| Rapid-acting | Humalog (Eli Lilly) | ✓ | ✓ | ✓ | ✓ | ✓ |
| | Novolog (Novo Nordisk) | ✓ | ✓ | ✓ | Excluded | Excluded |
| | Apidra (Sanofi-Aventis) | ✓ | Excluded | ✓ | Excluded | Excluded |

### B.   Eli Lilly, Novo Nordisk and Sanofi Explain the *Quid Pro Quo* With PBMs

119.   As drug prices have come under fire in the United States in the last year, executives with the Drug Manufacturer Defendants have explained aspects of their pricing methods but purposefully reveal few details regarding their contracts for payments to PBMs. But they have sought to blame ever-rising rebates demanded by PBMs, combined with the PBMs' tactic of exclusionary formularies, for limiting consumer choice and higher insulin prices.

120.   The Chairman and CEO of Eli Lilly, John C. Lechleiter, described in June 2016 the source of some of the "challenges" Eli Lilly faced: "I think it somewhat has to do with the weird way the payment system can work in this country and the fact that higher rebates can be an incentive for a payer to stick with – with essentially a higher-priced product."

121.   Asked about PBMs and whether Eli Lilly has to "play the game" Lechleiter stated that payments for drugs in the U.S. "is getting more complex and more costly" and that something has to give. "[W]e talk a lot about what the payment system, the model, could look like down the road.  I'd be very surprised if there's not some disruption in the payment system at some point … In the meantime, we've got to work with the system that's in place."

122.    In a 2014 earnings guidance call, Eli Lilly disclosed some features of its contracts with PBMs even as it guarded their secrecy: "[I]n regard to major PBMs, we are not really at liberty to say how long agreements are with each of the PBMs when we enter into those. So I can't be specific on which ones might be coming up again for 2015. I think it's safe to assume each in every year there will be some number good sized accounts that are up for renegotiation."

123.    The president of Eli Lilly's diabetes business, Enrique Conterno, told the Wall Street Journal that his company's skyrocketing list prices were the result of PBMs demanding larger and larger rebates in return for access to their covered patients.

124.    Novo Nordisk on an October 2014 earnings call with Wall Street spoke about modern insulin and how the move toward exclusionary formularies has a negative effect on "free choice to the doctor and patient." According to Novo Nordisk, "[W]e basically support that there's access to more than one product in each category and that's what we've been striving for."

125.    On the earnings call, Novo Nordisk let slip what is really happening in the insulin market, before thinking better of explaining too much: "It's quite clear that from the PBM side, there has been a desire to have more exclusive contracts and in that connection increased rebates … as a consequence of this you have seen that some contracts in segments where there is very similar products you could say in a segment such as the fast-acting insulin segment, that has a tendency to have sometimes longer contracts, higher rebate levels and more price protection whereas in other areas where the products are more uniquely differentiated that's less so. But getting more specific than that, I think would carry, take it too far."

126.    On an October 2015 earnings call with Wall Street, Novo Nordisk described the PBMs' intentions: "[I]t's clear on the buy side that some of them would like to build exclusive contracts to drive up rebates."

127.    The Novo Nordisk 2016 Annual Report complained about how the insulin manufacturers are engaged in a contest to pay the large PBMs the most money in exchange for formulary access:  "The organizations with which Novo Nordisk negotiates rebates and access for its products are the pharmaceutical benefit managers (PBMs), which have seen their negotiating power increase due to a wave of consolidation that has left only a handful of very large PBMs. At the same time, competition among the pharmaceutical companies within diabetes care intensified as new products entered an increasingly crowded marketplace.  As a consequence of these developments, and as we announced in our half-year financial statement, contract negotiations for 2017 resulted in higher-than-anticipated rebates to obtain broader coverage for our products."

128.    Novo Nordisk continued to explain to investors how the Rebate Game works: "The most prominent market risk materializing in 2016 was a more challenging business environment in the US.  This was caused by a combination of several factors: through a wave of mergers and acquisitions, the main purchasers of medicines – pharmaceutical benefit managers (PBMs) – had strengthened their negotiating power, forcing pharmaceutical companies to either increase their rebates to get their products onto the PBMs' lists of approved, reimbursed products – or lose the contract."

129.    For its part, Sanofi, too, has publicly admitted to playing the Rebate Game. On an earnings call in February 2015, Executive Vice President and manager of Sanofi's diabetes efforts flatly stated the nature of the *quid pro quo* with PBMs: "As expected, increased rebates

in the U.S. to secure favorable formula repositions for Lantus with key players have kicked in since January 1st, 2015.

130.    A year later, Sanofi's Chief Financial Officer addressed the impact on Sanofi's insulin business of being excluded from CVS's formulary: "So, if you look at the way CVS is organized in the U.S., they are covering about 30 million lives as a PBM … I think it's actually 34 million. 15 million are part of the national formulary and that's very strict, all right. So, we wouldn't have access to those 15 million lives."

## IX.    THE REBATE GAME AND RESULTING INCREASED LIST PRICES INJURE THE CONSUMER

131.    Novo Nordisk recently acknowledged exactly which types of insulin patients are injured by the Drug Manufacturer Defendants' dramatic increases to analog insulin list prices. In a published picture Novo Nordisk identifies those patients paying some amount out-of-pocket for insulin where their price is directly linked to the list prices. "Those exposed to list price include patients: without insurance; fulfilling coinsurance or deductible requirements; within the Medicare Part D coverage gap."

*Figure 11:*



132. The second box from the left in the Novo Nordisk picture, "Rebates/Discounts" dwarfs the next two with respect to the amount of money involved, as wholesaler fees and coupons are insignificant next to the amount of money paid to PBMs "to ensure placement on drug formularies."

133. Indeed, high insulin list prices have many friends in the pharmaceutical industry. The PBM Defendants are making hundreds of millions in increased profits from the insulin Rebate Game which results in higher list prices. The Drug Manufacturer Defendants complain about the impact of the Rebate Game on their profits, but each has grown overall profits for analog insulin over the last five years.

134. Health insurers benefit because their portion of the rebates paid by drug manufacturers, passed through by PBMs, increase as list prices rise. The contracts between

PBMs and drug manufacturers require rebates to be paid to the payer on all prescriptions, even when insured patients pay the full costs of insulin because of high deductibles.

135.    For their part, the three large drug wholesalers prefer higher and higher insulin list prices, because their profits increase with list prices. McKesson Chairman, president and CEO John Hammergren explained on an October 2016 earnings call that McKesson's "revenue-based fees" go up as list prices inflate. Additionally, the wholesalers achieve what is called in the industry "inventory holding gains." That means that when a price increase occurs, all of the wholesaler's inventory is revalued to the new higher cost. This is a major source of a wholesaler's profit.

136.    Pharmacies, too, experience higher revenues as brand name drugs' list prices rise.

137.    Consequently, every entity in the chain of distribution (drug manufacturers, wholesalers, pharmacies) as well as PBMs benefit from higher insulin list prices.  The only injured insulin purchasers are Plaintiffs and the proposed Class members.

## X.    RELEVANT MARKET

138.    The relevant geographic market is the United States and its territories.

139.    The relevant product market is long-acting and rapid-acting analog insulin drugs, specifically Humalog, Novolog, Lantus, and Levemir. Through their patents, the Drug Manufacturer Defendants control the entire analog insulin market.

## XI.    TRADE AND COMMERCE

140.    During the Class Period,[10] the Defendants include all of the manufacturers of insulin and the largest pharmaceutical benefit managers in the United States.

---

[10] The "Class Period" is four years from the date of the filing of this complaint.

141.    During the Class Period, the Defendants manufactured, distributed, sold, reimbursed pharmacies for, contracted payments for, set benchmark prices on, and/or paid or received payments tied to Levemir, Lantus, Humalog, and/or Novolog in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the state in which the Defendants are located.

142.    In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Levemir, Lantus, Humalog, and/or Novolog, as well as payments and rebates for Levemir, Lantus, Humalog, and/or Novolog sold by certain Defendants, traveled in interstate trade and commerce. The business activities of Defendants in connection with the production, sale, and rebates tied to Levemir, Lantus, Humalog, and/or Novolog that were the subject of the unlawful conduct alleged were within the flow of, and substantially affected, interstate trade and commerce.

143.    The business activities of the Defendants that are the subject of this Complaint were within the flow of, and substantially affected, interstate trade and commerce.

## XII.    TOLLING THE STATUTE OF LIMITATIONS

### A.    Fraudulent Concealment and Tolling

144.    Plaintiffs and the members of the Class had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until shortly before this litigation commenced.

145.    Plaintiffs and the other members of the Class are individuals who paid a portion of the purchase for a prescription of Lantus, Levemir, Novolog, and/or Humalog at a price calculated by reference to a benchmark price.  They had no direct interaction with Defendants and had no means from which they could have discovered the combination or conspiracy

described in this Complaint prior to shortly before this litigation commenced.  Plaintiffs and the other members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation commenced.

146.    No information in the public domain was available to Plaintiffs or the other members of the Class prior to the commencement of this litigation.  Plaintiffs and the other members of the Class had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with direct purchasers of such drugs, much less the fact that they had engaged in the combination or conspiracy alleged herein.

147.    For these reasons, the statute of limitations as to Plaintiffs and the Class' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the other members of the Class have alleged in this Complaint.

148.    Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Class.

149.    Plaintiffs and the Class could not have discovered the violations earlier than they did, just prior to the filing of this Complaint, because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.  In addition, the conspiracy was by its nature self-concealing.

150.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs and the Class assert the tolling of any applicable statutes of limitations affecting the rights of action of Plaintiffs and the members of the Class.

**XIII.   CLASS ACTION ALLEGATIONS**

151.    Plaintiffs brings this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), and (b)(3) on behalf of the following class (the "Class"):

> All persons in the United States and its territories who paid any portion of the purchase for a prescription of Lantus, Levemir, Novolog, and/or Humalog at a price calculated by reference to a benchmark price, which include, but are not limited to WAC (Wholesale Acquisition Cost) or AWP (Average Wholesale Price).  Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.  The Class Period is four years from the date of the filing of this complaint.

152.    There are a number of ways in which a person may pay a portion of the purchase price of Lantus, Levemir, Novolog, and/or Humalog and thereby gain inclusion in the Class. First, a person may be uninsured and, therefore, responsible for paying 100% of the cost of her prescription needs (the "Uninsured Customer Scenario"). Second, a person's insurance plan may require her to satisfy a deductible before insurance benefits cover all or a portion of their prescription needs. If so, that person is paying for 100% of the cost of any prescriptions filled before the deductible is met (the "Deductible Scenario"). Third, a person may have a coinsurance requirement—an obligation to pay a portion of any prescription or medical benefit that they purchase, which is expressed as a percentage of the cost of the medication or service provided (the "Coinsurance Scenario"). If so, she would be responsible for paying for a portion of the Lantus, Levemir, Novolog, and/or Humalog purchase, consistent with the terms of her plan. Fourth, a person may obtain insurance through a Medicare Part D Plan; if so, there is a coverage gap, often referred to as the "Donut Hole" (the "Donut Hole Scenario"). Once that person and her plan has spent a stated amount of money on prescription drugs, the person becomes responsible for 40% of the cost of her brand-name prescriptions until her total annual

out-of pocket expenses reaches the next stated benchmark amount. After this benchmark, her plan covers the majority of her drug costs again. All of these individuals qualify as purchasers.

153.     In each of these scenarios—the Uninsured Customer Scenario, the Deductible Scenario, the Coinsurance Scenario, and the Donut Hole Scenario—a person's out-of-pocket expenses for Lantus, Levemir, Novolog, and/or Humalog are tied to and determined by the benchmark prices of these drugs. Accordingly, each falls within the class definition.

154.     The members of the Class are readily ascertainable from records maintained by the Defendants, Pharmacies and the Health Insurers.  Moreover, the class definition enable every member of the Class to identify itself as a Class member.

155.     Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Hundreds of thousands of prescriptions are written for Lantus, Levemir, Novolog, and Humalog throughout the United States and its territories every week, and these prescriptions are filled by hundreds of thousands of individuals.

156.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs' interests are not antagonistic to the claims of the other Class members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

157.     Plaintiffs will fairly and adequately protect and represent the interests of the Class.  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.

158.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law.

159.    Questions of law and fact common to the claims of Plaintiffs and the members of the Class predominate over questions that may affect the claims of only individual Class members because Defendants have acted on grounds generally applicable to the members of the Class.

160.    The common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to individual circumstances of any Class member include, but are not limited to, the following:

(a)    Whether the benchmark price(s) set by Defendants is used as a benchmark for payments by class members;

(b)    What the benchmark price(s) for Lantus, Levemir, Novolog, and Humalog is;

(c)    Whether Defendants are engaged in a course of conduct that improperly inflated the ultimate benchmark price(s) used by Plaintiffs and Class members as a basis for payment;

(d)    Whether Defendants artificially inflated the benchmark price(s);

(e)    Whether Drug Manufacturer Defendants gave rebates to PBM Defendants that created substantial differences between the benchmark price(s) and PBM negotiated price(s);

(f)    Whether the large difference between these prices benefitted the PBM Defendants;

(g)    Whether the large benchmark-to-real price difference (rebate amount) was intended to induce the PBM Defendants to give Lantus, Levemir, Novolog, and/or Humalog favorable placement on the PBMs' formularies;

(h)     Whether the large benchmark-to-real price difference (rebate amount) did induce the PBM Defendants to give Drug Manufacturer Defendants favorable placement on the PBMs' formularies;

(i)     Whether each Drug Manufacturer Defendant conspired with the PBM Defendants from the Pricing Enterprise for the purpose of carrying out its pricing fraud;

(j)     Whether Defendants conducted, or participated in the conduct of, the Pricing Enterprise(s);

(k)     Whether Defendants engaged in mail or wire fraud in furtherance of the Pricing Enterprise(s);

(l)     Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class members to make inflated payments for Lantus, Levemir, Novolog, and/or Humalog;

(m)     Whether Defendants engaged in deceptive fraudulent conduct;

(n)     Whether Defendants' deceptive and/or fraudulent activity was intended to defraud or harm Plaintiffs and Class members;

(o)     Whether Defendants engaged in a contract, combination or conspiracy to artificially increase the prices of Lantus, Levemir, Novolog, and/or Humalog in the U.S.;

(p)     The duration and extent of the alleged contract, combination or conspiracy;

(q)     Whether Defendants were participants in the contract, combination or conspiracy;

(r)     The effect of the contract, combination or conspiracy on the prices of Lantus, Levemir, Novolog, or Humalog in the United States and its territories during the Class Period;

(s)     Whether Defendants' conduct caused supra-competitive prices for Lantus, Levemir, Novolog, or Humalog;

(t)     Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and other members of the Class;

(u)     Whether the alleged contract, combination or conspiracy violated the state antitrust laws alleged;

(v)     Whether the alleged contract, combination or conspiracy violated the state unfair competition laws and/or state consumer protection laws alleged;

(w)     Whether Plaintiffs and the other members of the Class are entitled to recover damages, treble damages as a result of Defendants' violations of the state laws alleged;

(x)     Whether Defendants' conduct violated RICO;

(y)     Whether the Defendants are liable to Plaintiffs and the Class for damages flowing from their misconduct;

(z)     Whether the alleged contract, combination or conspiracy violated Sections l and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) ;

(aa)    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and the other members of the Class, and if so, the appropriate measure of damages; and

(bb)    Whether Plaintiffs and the other members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

161.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated individuals to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

162.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

163.   Class treatment will permit adjudication of relatively small claims by many Class members that otherwise could not afford to litigate an antitrust claim such as is asserted in this compliant on an individual basis.

164.   The Class is readily definable through data obtainable from sources including, but not limited to, purchasing data and records of drug manufacturers, PBMs, pharmacies and Health Insurers.

165.   Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

XIV.   CLAIMS FOR RELIEF

COUNT ONE

VIOLATION OF §§ 1 AND 3 OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3, <em>ET SEQ.</em><br>
For injunctive relief under Section 16 of the Clayton Act for Defendants'<br>
Violation of Sections 1 and 3 of the Sherman Act

166.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

167.     During the Class Period, Defendants engaged in a contract(s), combination(s) or conspiracy to restrain trade among the United States in violation of §§1 and 3 of the  Sherman Act, 15 U.S.C. §§1 and 3, and Section 16 of the Clayton Act, 15 U.S.C. § 26.

168.     Each contract or agreement between a PBM Defendant and a Drug Manufacturer Defendant that had within its scope an analog insulin drug by the brand name Lantus, Levemir, Novolog and/or Humalog, and which provided the Drug Manufacturer Defendant would make a payment to the PBM Defendant in an amount set as a percentage or portion of the drug's list price (alternately expressed as a percentage or portion of the drug's benchmark price) is a contract or agreement in restraint of trade.

169.     These contracts or agreements injured competition by supplanting pro-competitive competition between the Drug Manufacturer Defendants to lower analog insulin prices with an anticompetitive contest to offer the highest payment to the PBM Defendant.

170.     These contracts or agreements facilitated market allocation by the PBM Defendants to the Drug Manufacturer Defendants, which had the effect of lowering output and reducing consumer choice.

171.     These agreements, in addition to lowering output and reducing consumer choice, had the effect of raising analog insulin prices to Plaintiffs and the Class.

172.    These contracts unlawfully restrained trade in the United States market for analog insulin brand-name drugs Lantus, Levemir, Novolog and Humalog.

173.    Plaintiffs are injured in their business or property by paying a higher price that they would have but-for the unlawful restraints of trade.

174.    The violations are ongoing.  Insulin consumers frequently must stay on a monthly, weekly or even daily course of insulin treatment.  Consequently the threat of continued harm is imminent and will continue unless enjoined by the Court.

175.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class paid more for Levemir, Lantus, Levemir, and  Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct.

176.    By reason of Defendants' unlawful conduct, Plaintiffs and members of the  Class have been deprived of free and open competition on the real prices of Levemir,  Lantus, Levemir, and Humalog in the United States and its territories.

177.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and damaged in their property in an amount to be  determined.

178.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and members of the Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT TWO

**VIOLATION OF §§ 1 AND 3 OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3, *ET SEQ*.**
**For Damages under Section 4 of the Clayton Act for Defendants'**
**Violation of Sections 1 and 3 of the Sherman Act**

179.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

180.    During the Class Period, Defendants engaged in a contract(s), combination(s) or conspiracy to restrain trade among the United States in violation of §§1 and 3 of the  Sherman Act, 15 U.S.C. §§1 and 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

181.    Each contract or agreement between a PBM Defendant and a Drug Manufacturer Defendant that had within its scope an analog insulin drug by the brand name Lantus, Levemir, Novolog and/or Humalog, and which provided the Drug Manufacturer Defendant would make a payment to the PBM Defendant in an amount set as a percentage or portion of the drug's list price (alternately expressed as a percentage or portion of the drug's benchmark price) is a contract or agreement in restraint of trade.

182.    These contracts or agreements injured competition by supplanting pro-competitive competition between the Drug Manufacturer Defendants to lower analog insulin prices with an anticompetitive contest to offer the highest payment to the PBM Defendant.

183.    These contracts or agreements facilitated market allocation by the PBM Defendants to the Drug Manufacturer Defendants, which had the effect of lowering output and reducing consumer choice.

184.    These agreements, in addition to lowering output and reducing consumer choice, had the effect of raising analog insulin prices to Plaintiffs and the Class.

185.    These contracts unlawfully restrained trade in the United States market for analog insulin brand-name drugs Lantus, Levemir, Novolog and Humalog.

186.    Plaintiffs are injured in their business or property by paying a higher price than they would have but-for the unlawful restraints of trade.

187.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class paid more for Levemir, Lantus, Levemir, and  Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct.

188.    By reason of Defendants' unlawful conduct, Plaintiffs and members of the  Class have been deprived of free and open competition on the real prices of Levemir,  Lantus, Levemir, and Humalog in the United States and its territories.

189.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and damaged in their property in an amount to be  determined.

190.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiffs and members of the Class also seek damages against Defendants for the violations alleged herein.

<u>**COUNT THREE**</u>

**VIOLATION OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS**

191.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.[11]

192.    Plaintiffs and Class members in the "Uninsured Customer Scenario" allege the following allegations in Count Three against all Defendants.

193.    Plaintiffs and Class members in the "Deductible Scenario," "Coinsurance Scenario," and/or "Donut Hole Scenario" allege the following allegations in Count Three against Drug Manufacturer Defendants.

**Violation of Alabama Code §§ 6-5-60, *et seq.***

---

[11] Plaintiffs will provide a copy of this action to the Attorney Generals for each U.S. state and territory, as well as certain state Department of Justice offices, pursuant to applicable state statutes.

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Alabama.

b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Alabama; (2) product prices for Levemir, Lantus, Novolog, and Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout Alabama; and (3) Alabama consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.     During the Class Period, Defendants' unlawful conduct substantially affected Alabama's commerce.

d.     Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Alabama consumers, and they are threatened with further such injury.

### Violation of Arizona Rev. Stat. §§ 44-1401, *et seq.*

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Arizona.

b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Arizona; (2) product prices for Levemir, Lantus, Novolog, and

Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout Arizona; and (3) Arizona consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

        c.      During the Class Period, Defendants' unlawful conduct substantially affected Arizona's commerce.

        d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Arizona consumers, and they are threatened with further such injury.

        e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

### Violation of the California Cartwright Act
### (Cal. Bus. & Prof. Code §§ 16720, *et seq.*)

        a.      Defendants entered into and engaged in a continuing unlawful trust in restraint of trade and commerce as described above in violation of California's Cartwright Act. Defendants, and each of them, have acted in violation of Cal. Bus. & Prof. Code §§ 16720, *et seq.* to fix, raise, stabilize and maintain prices of Levemir, Lantus, Novolog, and Humalog at supra-competitive levels.

        b.      The aforesaid violations of Cal. Bus. & Prof. Code §§ 16720, *et seq.* consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, Levemir, Lantus, Novolog, and Humalog.

        c.      During the Class Period, Defendants controlled the market for Levemir, Lantus, Novolog, and Humalog and therefore controlled prices in the market for Levemir, Lantus, Novolog, and Humalog.  Defendants competed in this market.

d.      For the purpose of forming and effectuating the unlawful trust, the Defendants have done those things which they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, including fixing, raising, stabilizing and/or maintaining the price of Levemir, Lantus, Novolog, and Humalog.

e.      The combination and conspiracy herein had, inter alia, the following effects:  (1) price competition in the sale of Levemir, Lantus, Novolog, and Humalog has been restrained, suppressed and/or eliminated in the State of California; (2) prices for Levemir, Lantus, Novolog, and Humalog sold by Defendants have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in California; and (3) California consumers that purchased Levemir, Lantus, Novolog, and Humalog have been deprived of the benefit of free and open competition.

f.      Defendants' combination and conspiracy constitutes a per se violation of the Cartwright Act, and is, in any event, an unreasonable and unlawful restraint of trade.

g.      Defendants' conspiracy and the resulting impact on the market for Levemir, Lantus, Novolog, and Humalog occurred in and affected California's commerce.

h.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to California consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.  As a result of Defendants' violation of Cal. Bus. & Prof. Code §§ 16720, *et seq.*, Plaintiffs and members of the Class seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Cal. Bus. & Prof. Code § 16750(a).

**Violation of District of Columbia Code Ann. §§ 28-4501, *et seq*.**

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in the District of Columbia.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) consumers in the District of Columbia paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' illegal conduct substantially affected the District of Columbia's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to District of Columbia consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq*.

**Violation of Florida Stat. §§ 501.201, *et seq*.**

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Florida.

b.       Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Florida; (2) product prices for Levemir, Lantus, Novolog, and Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout Florida; and (3) Florida consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.       During the Class Period, Defendants' unlawful conduct substantially affected Florida's commerce.

d.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Florida consumers, and they are threatened with further such injury.

### Violation of 9 Guam Code Ann. §§ 69.10, *et seq.*

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Guam.

b.       Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Guam; (2) product prices for Levemir, Lantus, Novolog, and Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout

Guam; and (3) Guam consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Guam's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Guam consumers, and they are threatened with further such injury.

### Violation of Hawaii Rev. Stat. §§ 480-1, *et seq.*

e.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Hawaii.

f.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Hawaii; (2) product prices for Levemir, Lantus, Novolog, and Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout Hawaii; and (3) Hawaii consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

g.      During the Class Period, Defendants' unlawful conduct substantially affected Hawaii's commerce.

h.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Hawaii consumers, and they are threatened with further such injury.

**Violation of 740 Illinois Comp. Stat. Ann. 10/1, *et seq.***

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Illinois.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Illinois; (2) product prices for Levemir, Lantus, Novolog, and Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout Illinois; and (3) Illinois consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Illinois's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Illinois consumers, and they are threatened with further such injury.

**Violation of Iowa Code §§ 553, *et seq.***

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Iowa.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed,

and eliminated throughout Iowa; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; and (3) Iowa consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

        c.     During the Class Period, Defendants' unlawful conduct substantially affected Iowa's commerce.

        d.     Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Iowa consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct and are threatened with further such injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Iowa consumers seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

### Violation of Kansas Stat. Ann. §§ 50-101, *et seq.*

        a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Kansas.

        b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for generic Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Kansas; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout

Kansas; and (3) Kansas consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

       c.      During the Class Period, Defendants' unlawful conduct substantially affected Kansas's commerce.

       d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Kansas consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*  Accordingly, Kansas consumers seek all forms of relief available under Kan. Stat. Ann. §§ 50-101, *et seq.*

### Violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

       a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Maine.

       b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Maine; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; and (3) Maine consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Maine's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Maine consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. 10, §§1101, *et seq*.  Accordingly, Maine consumers seek all forms of relief available under Me. Rev. Stat. Ann. 10, §§1101, *et seq*.

### Violation of Massachusetts Gen. Law ch. 93A §§ 1, *et seq*.

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Massachusetts.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Massachusetts; (2) product prices for Levemir, Lantus, Novolog, and Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout Massachusetts; and (3) Massachusetts consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Massachusetts's commerce.

d.     Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Massachusetts consumers, and they are threatened with further such injury.

**Violation of Michigan Antitrust Reform Act,**
**(Mich. Comp. Laws Ann. §§ 445.771, *et seq*.)**

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Michigan.

b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Michigan; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; and (3) Michigan consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.     During the Class Period, Defendants' unlawful conduct substantially affected Michigan's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Michigan consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Michigan consumers seek treble damages and the costs of suit, including attorneys' fees and

reasonable costs of the action, all forms of relief available under Mich. Comp. Laws Ann. §§ 445.771, *et seq*.

## Violation of Minnesota Antitrust Law
### (Minn. Stat. §§ 325D.490, *et seq*.)

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Minnesota.

b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Minnesota; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; and (3) Minnesota consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.     During the Class Period, Defendants' unlawful conduct substantially affected Minnesota's commerce.

d.     Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Minnesota consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§ 325D.49, *et seq*.  Accordingly, Minnesota consumers seek all forms of relief available under Minn. Stat. §§ 325D.49, *et seq*.

## Violation of the Mississippi Antitrust Act

**(Miss. Code Ann. §§ 75-21-1, *et seq*.)**

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Mississippi.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Mississippi; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; and (3) Mississippi consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Mississippi's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Mississippi consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq*.  Accordingly, Mississippi consumers seek all forms of relief available under Miss. Code Ann. §§ 75-21-1, *et seq*.

**Violation of Montana Code §§ 30-14-201, *et seq*.**

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Montana.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Montana; (2) product prices for Levemir, Lantus, Novolog, and Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout Montana; and (3) Montana consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Montana's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Montana consumers, and they are threatened with further such injury.

### Violation of Nebraska Rev. Stats. §§ 59-801, *et seq.*

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Nebraska.   Such conduct constitutes an unlawful contract, combination, and/or conspiracy in restraint of trade, in violation of Neb. Rev. Stat. §§ 59-801, *et seq*.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Nebraska; (2) product prices for Levemir, Lantus, Novolog, and

Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout Nebraska; and (3) Nebraska consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class period, Defendants' unlawful conduct substantially affected Nebraska's trade.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Nebraska consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than the otherwise would have paid in the absence of Defendants' unlawful conduct, and they are threatened with further such injury.  Accordingly, Nebraska consumers seek all forms of relief available under Neb. Rev. Stat. §§ 59-821.

## Violation of Nevada Unfair Trade Practice Act
### (Nev. Rev. Stat. Ann. §§ 598A, *et seq.*)

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Nevada.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Nevada; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; and (3) Nevada consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Nevada's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Nevada consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A, *et seq*. Accordingly, Nevada consumers seek all forms of relief available under Nev. Rev. Stat. Ann. §§ 598A, *et seq*.

### Violation of New Mexico Antitrust Act
### (N.M. Stat. Ann. §§ 57-1-1, *et seq*.)

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in New Mexico.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout New Mexico; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; and (3) New Mexico consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected New Mexico's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to New Mexico consumers, in that they paid more

for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, New Mexico consumers seek all forms of relief available under N.M. Stat. Ann. §§ 57-1-1, *et seq.*

### Violation of New Hampshire Rev. Stat. Ann. § 356, *et seq.*

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in New Hampshire.

b.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout New Hampshire; (2) product prices for Levemir, Lantus, Novolog, and Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout New Hampshire; and (3) New Hampshire consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.     During the Class Period, Defendants' unlawful conduct substantially affected New Hampshire's commerce.

d.     Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to New Hampshire consumers, and they are threatened with further such injury.

### Violation of New York Donnelly Act
### (N.Y. Gen. Bus. Law §§ 340, *et seq.*)

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in New York.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout New York; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; and (3) New York consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      Defendants' acts and practices set forth above were carried out with the intent to injure Plaintiffs and the public.

d.      During the Class Period, Defendants' unlawful conduct substantially affected New York's commerce.

e.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to New York consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and they are threatened with further such injury.

f.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.Y. Gen. Bus. Law. §§ 340, *et seq*.  Accordingly, New York consumers seek to enjoin Defendants from engaging in future anti-competitive practices and seek damages and all forms of relief available under N.Y. Gen. Bus. Law §§ 340, *et seq*.

**Violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.**

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in North Carolina.

b.       Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout North Carolina; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; and (3) North Carolina consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.       During the Class Period, Defendants' unlawful conduct substantially affected North Carolina's commerce.

d.        Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to North Carolina consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq*.  Accordingly, North Carolina consumers seek all forms of relief available under N.C. Gen. Stat. §§ 75-1, *et seq*.

### Violation of North Dakota Uniform State Antitrust Act
### (N.D. Cent. Code §§ 51-08.1, *et seq*.)

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-

competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in North Dakota.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout North Dakota; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; and (3) North Dakota consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected North Dakota's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to North Dakota consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of N.D. Cent. Code §§ 51-08.1, *et seq.* Accordingly, Plaintiffs and members of the Class seek all forms of relief available under N.D. Cent. Code §§ 51-08.1, *et seq.*

### Violation of Oregon Antitrust Law
### (Or. Rev. Stat. §§ 646.725, *et seq.*)

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Oregon.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Oregon; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; and (3) Oregon consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected Oregon's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Oregon consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and they are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Or. Rev. Stat. §§ 646.725, *et seq.*  Accordingly, consumers in Oregon seek all forms of relief available under Or. Rev. Stat. §§ 646.725, *et seq.*

**Violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.***

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in South Dakota.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout South Dakota; (2) prices of Levemir, Lantus, Novolog, and Humalog

were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; and (3) South Dakota consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.    During the Class Period, Defendants' unlawful conduct substantially affected South Dakota commerce.

d.    Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to South Dakota consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S.D. Codified Laws Ann. §§ 37-1, *et seq.*  Accordingly, consumers in South Dakota seek all forms of relief available under S.D. Codified Laws Ann. §§ 37-1, *et seq.*

### Violation of Tennessee Trade Practices Act ("TTPA") (Tenn. Code Ann. §§ 47-25-101, *et seq.*)

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Tennessee.

b.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Tennessee; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; and (3) consumers in Tennessee paid supra-competitive, artificially inflated prices for Levemir,

Lantus, Novolog, and Humalog.  This injury is of the type the TTPA was designed to prevent.  Accordingly, Plaintiffs and the Class seek damages to the extent permitted.

c.       During the Class Period, Defendants' unlawful conduct substantially affected Tennessee's commerce by unlawfully and unreasonably fixing, maintaining and stabilizing the price for Levemir, Lantus, Novolog, and Humalog, Defendants blocked and otherwise denied Plaintiffs and the members of the Class access to a free and competitive market.

d.       Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Tennessee consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and they are threatened with further such injury.

e.       By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq*.  Accordingly, consumers in Tennessee seek all forms of relief available under Tenn. Code. Ann. §§ 47-25-101, *et seq*., including, but not limited to, their full consideration paid pursuant to Tenn. Code. Ann. § 47-25-106.

**Violation of Utah Code §§ 76-10-3101, *et seq.***

a.       Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Utah.

b.       Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed,

and eliminated throughout Utah; (2) product prices for Levemir, Lantus, Novolog, and Humalog were fixed, raised, maintained, and stabilized at artificially high levels throughout Utah; and (3) Utah consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.        During the Class Period, Defendants' unlawful conduct substantially affected Utah's commerce.

d.        Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Utah consumers, and they are threatened with further such injury.

### Violation of Vermont Stat. Ann. tit. 9 §§ 2453, *et seq*.

a.        Defendants agreed to, and did in fact, act in restraint of trade or commerce by, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Vermont.

b.        Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Vermont; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; and (3) consumers in Vermont paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.        During the Class Period, Defendants' unlawful conduct substantially affected Vermont's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Vermont consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*  Accordingly, consumers in Vermont seek all forms of relief available under Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*, including, but not limited to, relief pursuant to Vt. Stat. Ann tit.9 § 2465.

### Violation of West Virginia Antitrust Act
### (W.V. Code §§ 47-18, *et seq.*)

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in West Virginia.

b.      Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout West Virginia; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; and (3) consumers in West Virginia paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.      During the Class Period, Defendants' unlawful conduct substantially affected West Virginia's commerce.

d.      Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to West Virginia consumers, in that they paid more

for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and are threatened with further such injury.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of W.V. Code §§ 47-18-1, *et seq*.  Accordingly, West Virginia consumers seek all forms of relief available under W.V. Code § 47-18-9.

### Violation of Wisconsin Stat. §§ 133.01, *et seq*.

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Levemir, Lantus, Novolog, and Humalog were sold, distributed or obtained in Wisconsin.

b.  Defendants' combinations or conspiracies had the following effects: (1) price competition for Levemir, Lantus, Novolog, and Humalog was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices of Levemir, Lantus, Novolog, and Humalog were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; and (3) Wisconsin consumers paid supra-competitive, artificially inflated prices for Levemir, Lantus, Novolog, and Humalog.

c.  During the Class Period, Defendants' unlawful conduct substantially affected Wisconsin's commerce.

d.  Defendants' unlawful conduct was a proximate and material cause of, and/or a substantial factor in causing, injury to Wisconsin consumers, in that they paid more for Levemir, Lantus, Novolog, and Humalog than they otherwise would have paid in the absence of Defendants' unlawful conduct, and they are threatened with further such injury.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wis. Stat. §§ 133.01, *et seq.*   Accordingly, Wisconsin consumers seek all forms of relief available under Wis. Stat. §§ 133.01, *et seq.*

## COUNT FOUR

### VIOLATION OF STATE CONSUMER PROTECTION AND UNFAIR COMPEITITON LAWS

194.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each of the paragraphs set forth above.[12]

195.    Plaintiffs and Class members in the "Uninsured Customer Scenario" allege the following allegations in Count Four against all Defendants.

196.    Plaintiffs and Class members in the "Deductible Scenario," "Coinsurance Scenario," and/or "Donut Hole Scenario" allege the following allegations in Count Four against Drug Manufacturer Defendants.

### Violation of the Alabama Deceptive Trade Practices Act (Ala. Code §§ 8-19-1, *et seq.*)

197.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

198.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions"; and "(27) Engaging in

---

[12] Plaintiffs will provide a copy of this action to the Attorney General's office for each U.S. state and territory, as well as certain United States and territory Consumer Protection Division, Consumer Affairs in Dept. of Commerce & Insurance, County Attorney, Commissioner of Consumer Protection, Consumer Law Section, and local District Attorney, pursuant to applicable state statutes.  Manufacturer Defendants were put on notice of their conduct alleged in this complaint as of February 2, 2017 when a class action complaint against Drug Manufacturer Defendants was filed that included allegations related to the same conduct here.  On March 8, 2017, Plaintiffs sent demand letters to Defendants, pursuant to applicable state statutes.

any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

199.    Plaintiffs and class members are "consumers" within the meaning of Ala. Code. § 8-19-3(2).

200.    Plaintiffs and members of the Class are "person[s]" within the meaning of Ala. Code § 8-19-3(5).

201.    Each Defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

202.    Pursuant to Alabama Code § 8-19-10, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

203.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code. §§ 8-19-1, *et seq.*

### Violation of the Alaska Unfair Trade Practices and Consumer Protection Act
### (Alaska Stat. Ann. §§ 45.50.471, *et seq.*)

204.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

205.    The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA") declared unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "(10) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the

concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." Alaska Stat. Ann. § 45.50.471(b).

206.     Pursuant to Alaska Stat Ann. § 45.50.531, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each Plaintiff.

207.     Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. Ann. § 45.50.535, attorneys' fees, and any  other just and proper relief available under the Alaska CPA.

### Violation of the Arizona Consumer Fraud Act
### (Ariz. Rev. Stat. §§ 44-1521, *et seq.*)

208.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

209.     The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception or unfair, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

210.     Defendants, Plaintiffs, and class members are "person[s]" within the meaning of the  Arizona CFA, Ariz. Rev. Stat. § 44-1521(6).

211.     Each drug at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

212.    Defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

213.    Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against each Defendant in an amount to be determined at trial.  Plaintiffs also seek punitive damages because each Defendant engaged in aggravated and outrageous conduct with an evil mind.

214.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

### Violation of the Arkansas Deceptive Trade Practices Act
### (Ark. Code Ann. §§ 4-88-101, *et seq.*)

215.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

216.    The Arkansas Deceptive Trade Practices Act ("Arkansas DTPA") prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to,  "(10) [e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce, or trade."  Ark. Code. Ann. § 4-88-107(a).  The Arkansas DTPA also prohibits, in  connection with the sale or advertisement of any goods, "(1) [t]he act, use, or employment by any  person of any deception, fraud, or false pretense; or (2) [t]he concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."  Ark Code. Ann. § 4-88-108.

217.    Defendants, Plaintiffs, and Class members are "persons" within the meaning of Ark. Code. Ann. § 4-88-102(5).

218.    Each drug at issue constitutes "goods" within the meaning of Ark. Code Ann. § 4- 88-102(4).

219.     Plaintiffs seek monetary relief against Defendants in an amount to be determined at trial.  Plaintiffs also seek punitive damages because Defendants acted wantonly in causing Plaintiffs' and class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

220.     Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, and for attorneys' fees, and any other just and proper relief available under the  Arkansas DTPA.

### Violation of the California Legal Remedies Act
### (Cal. Civ. Code §§ 1750, *et seq.*)

221.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

222.     The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the  sale or lease of goods or services to any consumer[.]"  Cal. Civ. Code § 1770(a).

223.     Each Defendant is a "person" under Cal. Civ. Code § 1761(c).

224.     Plaintiffs and class members are "consumers" as defined by Cal. Civ. Code § 1761(d), who purchased one or more prescriptions of each drug at issue.

225.     Plaintiffs seek injunctive relief under the CLRA.

226.     Plaintiffs seek, under Cal. Civ. Code § 1780(a), monetary relief against each Defendant for the harm caused by Defendants' violations of the CLRA as alleged herein.

227.     Under Cal. Civ. Code § 1780(b), Plaintiffs seek an additional award against each Defendant of up to $5,000 for each Plaintiff or Class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Each Defendant knew or should have known that its conduct was directed to one or more Plaintiffs or Class members who are senior citizens or

disabled persons. Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person. One or more Plaintiffs or Class members who are senior citizens or disabled persons are substantially more vulnerable to each Defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from each Defendant's conduct.

228.     Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, costs of court, and attorneys' fees pursuant to Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

### Violation of the California Unfair Competition Law
### (Cal. Bus. & Prof. Code S§ 17200, *et seq.*)

229.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

230.     California Business and Professions Code §§ 17200, *et seq.* (the "Unfair Competition Law," or "UCL") prohibits "unlawful, unfair, or fraudulent business act[s] or practice[s]." Defendants violated the "unlawful" prong of § 17200 by their violations of the CLRA, Cal. Civ. Code §§ 1750, *et seq.*, as described above. Defendants have also violated the "fraudulent" prong of § 17200 through their pricing fraud, as described throughout this complaint. And Defendants violated the "unfair" prong of § 17200 because the acts and practices set forth in this complaint, including artificially inflating benchmark prices to offer large rebates to the PBMs causing Defendants and the PBMs to profit at the expense of consumers, and the harm caused to consumers greatly outweighs any benefits associated with those practices.

231.    Defendants' actions, as set forth above, occurred within the conduct of their business, and in trade or commerce.

232.    Plaintiffs request that this Court enter such orders or judgments as may be necessary, including a declaratory judgment that each Defendant has violated the UCL; an order enjoining Defendants from continuing their unfair, unlawful and/or fraudulent trade practices; an order restoring to Plaintiffs any money lost as result of each Defendants' unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits Defendants received as a result of their unfair, unlawful, or fraudulent practices, as provided in Cal. Bus. & Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code § 3345; and for any other relief as may be just and proper.

### Violation Of The Colorado Consumer Protection Act
### (Colo. Rev. Stat. §§ 6-1-101, *et seq.*)

233.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

234.    The Colorado Consumer Protection Act ("Colorado CPA") prohibits deceptive practices in the course of a person's business including, but not limited to, "(1) mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;" and "(u) fail[ing] to disclose material information   concerning goods, services, or property which information was known at the time of an  advertisement or sale if such failure to disclose such information was intended to induce the  consumer to enter into a transaction."  Colo. Rev. Stat. § 6-1-105.

235.    Each Defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

236.    Plaintiffs and class members are "consumer[s]" for purposes of Colo. Rev. Stat. § 6-1-113(1)(a).

237.     Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs seek monetary relief against each Defendant, an order enjoining each Defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

### Violation of the Connecticut Unfair Trade Practices Act
### (Conn. Gen. Stat. §§ 42-110a, et seq.)

238.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

239.     The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

240.     Each Defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

241.     Defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

242.     Plaintiffs and class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

243.     Defendants acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

**Violation of the Delaware Consumer Fraud Act**
**(Del. Code tit. 6, §§ 2511,** *et seq.***)**

244.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

245.     The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby." Del. Code tit. 6, § 2513(a).

246.     Each Defendant is a "person" within the meaning of Del. Code tit. 6, § 2511(7).

247.     Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct. Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees,   and any other just and proper relief available under the Delaware CFA.

**Violation of the D.C. Consumer Protection Procedures Act**
**(D.C. Code §§ 28-3901, et s***eq.***)**

248.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

249.     The Consumer Protection Procedures Act ("District of Columbia CPPA") states: "It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to," *inter alia*, "(f) fail to state a material fact if such failure tends to mislead;" "(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead;" "(j) make false or misleading representations of fact concerning the reasons for,

existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time;" or "(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices." D.C. Code § 28-3904.

250.     Each Defendant is a "person" under D.C. Code § 28-3901(a)(1).

251.     Plaintiffs and Class members are "consumers," as defined by D.C. Code § 28-3901(a)(2), who purchased the drugs at issue.

252.     Defendants' actions as set forth in this complaint constitute "trade practices" under D.C. Code § 28-3901(a)(6).

253.     Plaintiffs and class members are entitled to recover treble damages or $1500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the court deems proper, under D.C. Code § 28-3905(k)(2).

254.     Plaintiffs seek punitive damages against Defendants because Defendants' conduct evidences malice and/or egregious conduct. Defendants misrepresented the actual price of these drugs, inflated the benchmark price, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase their profits at the expense of consumers. They manipulated the price of their life-saving products without regard to the impact of their scheme on consumers' ability to afford to buy a product necessary to sustain their life. Defendants' conduct constitutes malice warranting punitive damages.

### Violation of the Florida Deceptive and Unfair Trade Practices Act
### (Fla. Stat. §§ 501.201, *et seq.*)

255.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

256.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

257.     Plaintiffs and Class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

258.     Each Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

259.     Plaintiffs are entitled to recover their actual damages and attorneys' fees under Fla. Stat. §§ 501.211(2) and 501.2105(1).

260.     Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## Violation Of The Georgia Fair Business Practices Act
### (Ga. Code Ann. §§ 10-1-390, et *seq.*)

261.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

262.     Georgia's Fair Business Practices Act ("Georgia FBPA") prohibits "unfair or deceptive practices in the conduct of any trade or commerce."  Ga. Code Ann. § 10-1-391.

263.     Each Defendant is a "person" under Ga. Code Ann. § 10-1-392(a)(24).

264.     Plaintiffs and Class members are "consumer[s]" under Ga. Code Ann. § 10-1-392(a)(6).

265.     Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Ga. Code Ann. § 10-1-392(a)(28).

266.     Plaintiffs seek damages for injury resulting from the direct and natural consequences of each Defendants' unlawful conduct, an order enjoining each Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-399.

## Violation of the Georgia Uniform Deceptive Trade Practices Act
### (Ga. Code. Ann. §§ 10-1-370, et *seq.*)

267.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

268.     Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA") prohibits "deceptive trade practices," which include "(11) [m]ak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "(12) [e]ngages in any other conduct  which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann § 10-1-372(a).

269.     Defendants, Plaintiffs, and Class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

270.     Plaintiffs seek an order enjoining each  Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and  proper relief available under Ga. Code Ann. § 10-1-373.

## Violation of Guam Deceptive Trade Practice - Consumer Protection Act
### (5 Guam Code Ann. §§ 32101, *et seq.*)

271.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

272.     Guam Deceptive Trade Practice - Consumer Protection Act ("Guam CPA") prohibits "[f]alse, misleading or deceptive acts or practices" under  5 Guam Code Ann. §32201(a).

273.     Levemir, Lantus, Novolog, and Humalog are "consumer goods" under the 5 Guam Code Ann. § 32103(b).

274.     Plaintiffs and Class members are "consumer[s]" under 5 Guam Code Ann. § 32103(d).

275.     The advertising, offering for sale, and sale of Lantus, Levemir, Novolog, and Humalog is "trade" and "commerce" within the meaning of 5 Guam Code Ann. § 32103(p).

276.     Pursuant to 5 Guam § 32112, Plaintiffs seek damages, an order enjoining each Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Guam Deceptive Trade Practice-Consumer Protection Act.

277.     Defendants' sale of Levemir, Lantus, Novolog, and Humalog and their unconscionable and deceptive acts and practices in connection therewith was and is reckless, shows spite or will, or demonstrates indifference to the interests of consumers, as such Plaintiffs seek punitive damages pursuant to 5 Guam § 32112(a).

**Violation of the Hawaii Unfair or Deceptive Acts and Practices Act**
**(Haw. Rev. Stat. §§ 480-1, *et* seq.)**

278.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

279.     Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

280.     Each Defendant is a "person" under Haw. Rev. Stat. § 480-1.

281.     Plaintiffs and Class members are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1, who purchased the drug at issue.

282.     Pursuant to Haw. Rev. Stat. § 480-13, Plaintiffs and the Class seek monetary relief against each  Defendant measured as the greater of (a) $1000 and (b) threefold actual damages in an amount to  be determined at trial.

283.     Under Haw. Rev. Stat. § 480-13.5, Plaintiffs seek an additional award against each Defendant of up to $10,000 for each violation directed at a Hawaiian elder.  Each Defendant knew or should have known that its conduct was directed to one or more Plaintiffs who are elders.  Defendants' conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  Plaintiffs who are elders are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from each Defendant's conduct.

### Violation of the Idaho Consumer Protection Act
### (Idaho Code Ann. §§ 48-601, *et seq.*)

284.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

285.     The Idaho Consumer Protection Act ("Idaho CPA") prohibits deceptive business practices, including, but not limited to, "(11) [m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(17) [e]ngaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer;" or "(18) engaging in any unconscionable method, act or practice in the conduct of trade or  commerce," Idaho Code Ann.. § 48-603.

286.     Each Defendant, Plaintiff, and member fo the Class is a "person" under Idaho Code Ann. § 48-602(1).

287.     Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

288.     Pursuant to Idaho Code § 48-608, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1000 for each Plaintiff.

289.     Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho Code § 46-608.

290.     Plaintiffs also seek punitive damages against Defendants because each Defendant's conduct evidences an extreme deviation from reasonable standards.  Defendants flagrantly, maliciously, and fraudulently misrepresented the actual cost of their life-saving drugs and the  existence, purpose, and amount of the rebates granted to the PBMs; and concealed facts that only  the Defendants knew.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting  punitive damages.

### Violation of the Illinois Consumer Fraud a nd Deceptive Business Practices Act
### (815 Ill. Comp. Stat. §§ 505/1, *et seq.*)

291.     Plaintiffs hereby incorporate by  reference the allegations contained in the preceding paragraphs of this complaint.

292.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the

concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 Ill. Comp. Stat. § 505/2.

293.     Each Defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. § 505/1(c).

294.     Plaintiffs and class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

295.     Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs seek monetary relief against each Defendant in the amount of actual damages, as well as punitive damages because Defendants each acted with fraud and/or malice and/or were grossly negligent.

296.     Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

### Violation of the Indiana Deceptive Consumer Sales Act
### (Ind. Code §§ 24-5-0.5-3)

297.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

298.     Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to representations that "(6) a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not." Ind. Code § 24-5-0.5-3(b).

299.     Each Defendant is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2),  and a "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

300.     Plaintiffs' payments for insulin are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(1).

301.     Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1000 for Defendants' willfully deceptive acts.

### Violation of the Iowa Private Right of Action for Consumer Frauds Act
### (Iowa Code §§ 714H.1, *et seq.*)

302.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

303.     The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3.

304.     Each Defendant is a "person" under Iowa Code § 714H.2(7) and 714.16(l)(j).

305.     Plaintiffs and class members are "consumers" as defined by Iowa Code § 714H.2(3), who purchased insulin.

306.     Pursuant to Iowa Code § 714H.5, Plaintiffs seek an order enjoining each Defendant's unfair and/or deceptive acts or practices; actual damages; and statutory damages up to three times the amount of actual damages awarded as a result of each Defendant's willful and

wanton disregard for the rights and safety of others; attorneys' fees; and other such equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

## Violation Of The Kansas Consumer Protection Act
## (Kan. Stat. Ann. §§ 50-623, *et seq.*)

307.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

308.     The Kansas Consumer Protection Act ("Kansas CPA") states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a).  Deceptive acts or practices include, but are not limited to, "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" "(2) the willful failure to state a material fact, or the willful concealment, suppression  or omission of a material fact;" and "(7) making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions."  Kan. Stat. Ann. § 50-626.

309.     Plaintiffs and class members are "consumer[s]" within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased insulin.

310.     Defendants are "supplier[s]" within the meaning of Kan. Stat. Ann. § 50-624(1).

311.     The sale of insulin to Plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

312.     Pursuant to Kan. Stat. Ann. § 50-636, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff.

313.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kansas CPA.

### Violation of the Kentucky Consumer Protection Act
### (Ky. Rev. Stat. Ann. §§ 367.110, *et seq.*)

314.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

315.    The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. § 367.170(1).

316.    Defendants, Plaintiffs, and Class members are "person[s]" within the meaning of Ky. Rev. Stat. Ann. § 367.110(1).

317.    Each Defendant engaged in "trade" and "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

318.    Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees and any other just and proper relief available under Kentucky CPA.

### Violation of the Louisiana Unfair Trade Practices a nd Consumer Protection Law
### (LA. Rev. Stat. Ann. §§ 51:1401, *et seq.*)

319.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

320.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."  La. Rev. Stat. Ann. § 51:1405(A).

321.    Defendants, Plaintiffs, and class members are "person[s]" within the meaning of La. Rev. Stat. Ann. § 51:1402(8).

322.    Plaintiffs and class members are "consumer[s]" within the meaning of La. Rev. Stat. Ann. § 51:1402(1).

323.    Each Defendant engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. Ann. § 51:1402(10).

324.    Pursuant to La. Rev. Stat. Ann. § 51:1409, Plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for  knowing violations of the Louisiana CPL; an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under Louisiana CPL.

### Violation of the Maine Unfair Trade Practices Act
### (Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*)

325.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

326.    The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair  methods of competition and unfair or deceptive acts or practices in the conduct of any trade or  commerce."  Me. Rev. Stat. Ann. tit. 5, § 207.

327.    Defendants, Plaintiffs, and class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

328.     Defendants are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

329.     Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213, Plaintiffs seek actual damages, restitution, an order enjoining each Defendant's unfair and/or deceptive acts or practices, attorney's fees and all other relief available under the Maine UTPA.

## Violation of the Maryland Consumer Protection Act
### (MD. Code, Com. Law §§ 13-101, *et seq.*)

330.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

331.     The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "(3) failure to state a material fact if the failure deceives or tends to deceive;" "(6)false or misleading representation[s] of fact which concern[] . . . [t]he reason for or the existence or amount of a price reduction;" and "(9) [d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code, Com. Law § 13-301.

332.     Plaintiffs and members of the Class are "consumer[s]" within the meaning of Md. Code, Com. Law § 13-101(c).

333.     Defendants, Plaintiffs, and class members are "person[s]" within the meaning of Md. Code, Com. Law § 13-101(h).

334.     Pursuant to Md. Code, Com. Law § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## Violation of the Massachusetts Consumer Protection Law
### (Mass. Gen. Laws ch. 93A, §§ 1, *et seq.*)

335.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

336.    Massachusetts Consumer Protection Law (the "Massachusetts Act") prohibits "unfair or deceptive acts  or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2.

337.    Defendants, Plaintiffs, and class members are "person[s]" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

338.    Each Defendant engaged in "trade" and "commerce" within the meaning of Mass.  Gen. Laws ch. 93A, § 1(b).

339.    Pursuant to Mass. Gen. Laws ch. 93A, § 9(3), Plaintiffs will seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff.  Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff, up to three times actual damages, but no less than two times actual damages.

340.    Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

### Violation of the Michigan Consumer Protection Act
### (Mich. Comp. Laws §§ 445.901, *et seq.*)

341.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

342.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "(i) [m]aking false or misleading statements of fact concerning the reasons for,

existence of, or amounts of price reductions;" "(s) [f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(z) charging the consumer a price that is grossly in excess of the price at which similar property or services are sold;" "(bb) [m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" or "(cc) [f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

343.     Defendants, Plaintiffs, and Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

344.     Each Defendant is engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(g).

345.     Plaintiffs seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts; monetary relief against each Defendant; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

### Violation of the Minnesota Prevention of Consumer Fraud Act
### (Minn. Stat. §§ 325F.68, *et seq.*)

346.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

347.     The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1).

348.     Defendants, Plaintiffs, and members of the Class are "person[s]" within the meaning Minn. Stat. § 325.68(3).

349.     Humalog, Novolog, Levemir, and Lantus constitute "merchandise" and the Defendants' transactions involving these drugs are considered to be "sale[s]" within the meanings of Minn. Stat. § 325F.68(2) and (4).

350.     Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

351.     Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each Defendant's acts show deliberate disregard for the rights or safety of others.

### Violation of the Minnesota Uniform Deceptive Trade Practices Act
### (Minn. Stat. § 325D.43-48, *et seq.*)

352.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

353.     The Minnesota Uniform Deceptive Trade Practices Act ("Minnesota UDTPA") prohibits deceptive trade practices, which occur when a person "(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44.

354.     Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under Minn. Stat. § 325D.45.

355.     Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

**Violation of the Mississippi Consumer Protection Act**
**(Miss. Code. Ann. § 75-24-1, *et seq.*)**

356.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

357.     The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce." Miss. Code Ann. § 75-24-5(1).  Unfair or deceptive practices include, but are not limited to, "[m]isrepresentations of fact concerning the reasons for, existence of, or amounts of price reductions." Miss. Code Ann. § 75-24-5(2)(k).

358.     Defendants, Plaintiffs, and members of the Class are "persons[s] within the meaning of Miss. Ann. Code § 75-24-3(a).

359.     Each Defendants is engaged in "trade or commerce" within the meaning of Miss. Ann. Code § 75-24-3(b).

360.     Plaintiffs seek actual damages in an amount to be determined at trial and any other  just and proper relief available under the Mississippi CPA.

**Violation of the Missouri Merchandising Practices Act**
**(Mo. Rev. Stat. §§ 407.010, *et seq.*)**

361.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

362.     The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the  "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation,  unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020(1).

363.     Each Defendant, Plaintiff, and Class member is a "person" within the meaning of Mo. Rev. Stat. § 407.010(5).

364.     Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

365.     Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining each Defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

### Violation of the Montana Unfair Trade Practices a nd Consumer Protection Act of 1973 (Mont. Code Ann. §§ 30-14-101, *et seq.*)

366.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

367.     The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

368.     Defendants, Plaintiffs, and class members are "person[s]" within the meaning of Mont. Code Ann. § 30-14-102(6).

369.     Plaintiffs and class members are "consumer[s]" under Mont. Code Ann. § 30-14-102(1).

370.     The sale of each drug at issue occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and each Defendant committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

371.    Plaintiffs additionally seek actual damages, an order enjoining each Defendant's unfair, unlawful,  and/or deceptive practices, attorney's fees and any other relief the Court considers necessary or proper, under  Mont. Code Ann. § 30-14-133.

## Violation of the Nebraska Consumer Protection Act
### (Neb. Rev. Stat. §§ 59-1601, *et seq.*)

372.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

373.    The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Neb. Rev. Stat. § 59-1602.

374.    Defendants, Plaintiffs, and class members are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

375.    Defendants' actions as set forth herein occurred in the conduct of "trade or commerce" as defined under Neb. Rev. Stat. § 59-1601(2).

376.    Because Defendants' conduct caused injury to Plaintiffs' property through violations of the Nebraska CPA, Plaintiffs seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining each Defendant's unfair or deceptive acts and practices, reasonable attorneys' fees, and any other just and proper relief available under  Neb. Rev. Stat. § 59-1609.

## Violation of the New Jersey Consumer Fraud Act
### (N.J. Stat. Ann. §§ 56:8, *et seq.*)

377.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

378.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice,

deception,  fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression  or omission of any material fact with the intent that others rely upon such concealment,  suppression or omission, in connection with the sale or advertisement of any merchandise or real  estate, or with the subsequent performance of such person as aforesaid." N.J. Stat. Ann. § 56:8-2.

379.    Defendants, Plaintiffs, and Class members are "person[s]" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

380.    Defendants engaged in "sale[s]" of "merchandise" within the meaning of N.J. Stat.  Ann. § 56:8-1(c) and (d).

381.    Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining Defendants' unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief available under the New Jersey CFA.

**Violation of the Nevada Deceptive Trade Practices Act**
**(Nev. Rev. Stat. § 598.0903, *et seq*.)**

382.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

383.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive  trade practices. Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade  practice" if, in the course of business or occupation, the person: "(13) [m]akes false or misleading  statements of fact concerning the price of goods or services for sale or lease, or the reasons for,  existence of or amounts of price reductions;" "(15) [k]nowingly makes any other false representation   in a transaction;" "(2) [f]ails to disclose a material fact in connection with the sale or lease of goods  or services;" or "(a) [m]akes an assertion of scientific, clinical or

quantifiable fact in an  advertisement which would cause a reasonable person to believe that the assertion is true, unless,  at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion." Nev. Rev. Stat.  §§ 598.0915-25.

384.     Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining Defendants' deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA.  Nev. Rev. Stat. § 41.600.

<strong>Violation of the New Hampshire  Consumer Protection Act<br>(N.H. Rev. Stat. Ann. §§ 358-A, <em>et seq</em>.)</strong>

385.     Plaintiffs hereby incorporate by  reference the allegations contained in the preceding paragraphs of this complaint.

386.     The New Hampshire Consumer Protection Act ("New Hampshire CPA") prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice in the conduct of any trade and commerce," including, "but [] not limited to" "(XI) [m]aking false or misleading statements of  fact concerning the reasons for, existence of, or amounts of price reductions."  N.H. Rev. Stat.  Ann. § 358-A:2.

387.     Defendants, Plaintiffs, and Class members are "person[s]" under N.H. Rev. Stat. Ann. § 358-A:1(I).

388.     Defendants' actions as set forth herein occurred in the conduct of "trade" or " commerce" as defined under N.H. Rev. Stat. Ann. § 358-A:1(II).

389.     Because Defendants' willful conduct caused injury to Plaintiffs' property through  violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages; reasonable attorneys' fees; an order enjoining  each Defendant's unfair and/or deceptive acts and practices; and any other just and proper relief  under N.H. Rev. Stat. Ann. § 358-A:10-a.

## Violation of the New Mexico Unfair Practices Act
### (N.M. Stat. Ann. §§ 57-12-1, *et seq.*)

390.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

391.     The New Mexico Unfair Practices Practices Act ("New Mexico UPA") makes unlawful an "unfair or deceptive trade practices and unconscionable trade practices in the conduct of trade or commerce."  N.M. Stat. Ann. § 57-12-3.  An "unfair or deceptive trade practice is defined as "a false or misleading oral or written statement, visual description or other  representation of any kind knowingly made in connection with the sale, lease, rental or loan of  goods or services … by a person in the regular course of the person's trade or commerce, that  may, tends to or does deceive or mislead any person," including, but not limited to, "(11) failing to  state a material fact if doing so deceives or tends to deceive."  N.M. Stat. Ann. § 57-12-2(D).

392.     Defendants, Plaintiffs, and class members are "person[s]" under N.M. Stat. Ann. § 57-12-2(A).

393.     Defendants' actions as set forth herein occurred in the conduct of "trade" or " commerce" as defined under N.M. Stat. Ann. § 57-12-2(C).

394.     Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; and reasonable attorneys' fees, as well as all other  proper and just relief available under N.M. Stat. Ann. § 57-12-10.

## Violation of the New York Deceptive Acts & Practices Unlawful Act
### (N.Y. Gen. Bus. Law §§ 349, *et seq.*)

395.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

396.     The New York Deceptive Acts and Practices Unlawful Act ("New York Act") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen.  Bus. Law § 349(a).

397.     Plaintiffs and class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

398.     Each Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 350-d.

399.     Defendants' deceptive acts and practices, which were intended to mislead consumers who purchased insulin, was conduct directed at consumers.

400.     Because Defendants' willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; reasonable attorneys' fees; an order  enjoining Defendants' deceptive conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349(h) and § 350-e(3).

**Violation of the North Carolina Unfair and Deceptive Acts a nd Practices Act**
**(N.C. Gen. Stat. §§ 75-1, *et seq.*)**

401.     Plaintiffs hereby incorporate by  reference the allegations contained in the preceding paragraphs of this complaint.

402.     North Carolina's Unfair and Deceptive Acts and Practices Act (the "North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

403.     Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

404.     Plaintiffs seek an order for actual damages, an order enjoining Defendants' unlawful acts, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. §§ 75-16 and 75-16.1.

### Violation Of The North Dakota Consumer Fraud Act
### (N.D. Cent. Code §§ 51-15, *et seq.*)

405.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

406.     The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise."  N.D. Cent. Code § 51-15-02.

407.     Defendants, Plaintiffs, and class members are "person[s]" within the meaning of N.D. Cent. Code § 51-15-01(4).

408.     Defendants' engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(5) and (3).

409.     Defendants knowingly committed the conduct described above, and thus, under N.D. Cent. Code § 51-15-09, Defendants are liable to Plaintiffs for treble damages in amounts to be proven at trial, as well as attorneys' fees.  Plaintiffs further seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

### Violation of the Ohio Consumer Sales Practices Act
### (Ohio Rev. Code Ann. §§ 1345, *et seq.*)

410.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

411.    Ohio Consumer Sales Practices Act ("Ohio CSPA"), broadly prohibits "unfair or deceptive act[s] or practice[s] in connection with a consumer  transaction." Ohio Rev. Code Ann. § 1345.02(A).  Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing that "a specific price advantage exists, if it does not."  Ohio Rev. Code Ann. § 1345.02(8).

412.    Each Defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

413.    Plaintiffs and class members are "person[s]" and "consumer[s]" as defined in Ohio Rev.  Code Ann. § 1345.01(B) and (D), and their purchases of insulin are "consumer transaction[s]" within the   meaning of Ohio Rev. Code Ann. § 1345.01(A).

414.    As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an  amount to be proven at trial, and seek all just and proper remedies, including, but not limited to,   actual and statutory damages, an order enjoining Defendants' deceptive and unfair conduct, treble  damages, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09.

**Violation of the Oklahoma Consumer Protection Act**
**(Okla. Stat. Tit. 15, §§ 751, *et seq.*)**

415.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

416.    The Oklahoma Consumer Protection Act ("Oklahoma CPA") declares unlawful, *inter alia*, the following acts or when committed in the course of business: "(13) deceptive trade practice[s] defined as making a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person;" "(14) unfair trade practices" defined as "any practice which offends  established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to

consumers;" and making "(11) false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction." Okla. Stat. tit. 15, §§ 752-753.

417.     Defendants, Plaintiffs, and Class members are "person[s]" under Okla. Stat. tit. 15, § 752(1).

418.     The sale of insulin to Plaintiffs was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752(2).

419.     Because Defendants' unconscionable conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under Okla. Stat. tit. 15, § 761.1. Plaintiffs further seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

**Violation of the Oregon Unlawful Trade Practices Act**
**(Or. Rev. Stat. §§ 646.605,** *et seq.***)**

420.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

421.     The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(j)[m]ak[ing] false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) [m]ak[ing] false or misleading representations of fact concerning the offering price of, or the person's cost for . . . goods;" or "(u) [e]ngag[ing] in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

422.     Each Defendant, Plaintiff, and Class member is a "person" within the meaning of Or. Rev. Stat. § 646.605(4).

423.    Each drug at issue is a "good[]" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

424.    Defendants engaged in "trade" and commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

425.    Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Plaintiffs are also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others. Or. Rev. Stat. § 646.638(1)

### Violation of the Pennsylvania Unfair Trade Practices And Consumer Protection Law
### (73 Pa. Cons. Stat. §§ 201-1, *et seq.*)

426.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

427.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: "(xi) [m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "(xxi)[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4).

428.    Defendants, Plaintiffs, and Class members are "person[s]" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

429.    Plaintiffs purchased insulin "primarily for personal, family, or household purposes" within the meaning of 73 Pa. Cons. Stat. § 201-9.2.

430.    All of the acts complained of herein were perpetrated by Defendants in the course of "trade" and "commerce" within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

431.     Defendants are liable to Plaintiffs for treble their actual damages or $100, whichever is greater and reasonable attorneys' fees.  73 Pa. Cons. Stat. § 201-9.2(a).

**Violation of the Rhode Island Unfair Trade Practices and Consumer Protection Act
(R.I. Gen. Laws §§ 6-13.1, *et seq.*)**

432.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

433.     Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(xi) [m]aking false or misleading statements of fact concerning the reasons  for, existence of, or amounts of price reductions;" "(xii)[e]ngaging in any other conduct that similarly  creates a likelihood of confusion or of misunderstanding;" "(xiii) [e]ngaging in any act or practice that  is unfair or deceptive to the consumer;" and "(xiv) [u]sing any other methods, acts or practices which  mislead or deceive members of the public in a material respect."  R.I. Gen. Laws § 6-13.1-1(6).

434.     Defendants, Plaintiffs, and Class members are "person[s]" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

435.     Defendants were engaged in "trade" and "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

436.     Plaintiffs purchased insulin "primarily for personal, family, or household purposes"  within the meaning of R.I. Gen. Laws § 6-13.1-5.2(a).

437.     Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a).  Plaintiffs also seek punitive damages at the discretion of the Court.  R.I. Gen. Laws § 6-13.1-5.2(a).

**Violation Of The South Carolina Unfair Trade Practices Act**
**(S.C. Code Ann. §§ 39-5-10, *et seq.*)**

438.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

439.    The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a).

440.    Each Defendant, Plaintiff, and Class member is a "person" under S.C. Code Ann. § 39-5-10.

441.    Defendants were engaged in "trade" and "commerce" within the meaning of S.C. Code Ann. § 39-5-10(a).

442.    Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs seek monetary relief to recover their economic losses. Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled.

443.    Plaintiffs further seek an order enjoining each Defendant's unfair or deceptive acts or practices and all other relief provided for under South Carolina UTPA.

**Violation of the South Dakota Deceptive Trade Practices a nd Consumer Protection Law**
**(S.D. Codified Laws §§ 37-24, *et seq.*)**

444.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

445.    The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") prohibits deceptive acts or practices, which include "(1) [k]nowingly act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection

with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby;" and "(2) advertising price reductions without . . . including in the advertisement the specific basis for the claim of a price reduction or [o]ffering the merchandise for sale at the higher price from which the reduction is taken for at least seven consecutive business days during the sixty-day period prior to the advertisement." S.D. Codified Laws § 37-24-6(1)-(2).

446.    Each Defendant, Plaitniff, and member of the Class is a "person" under S.C. Code Ann. § 39-5-10(8).

447.    Defendants were engaged in "trade" and "commerce" within the meaning of S.C. Code Ann. § 39-5-10(a).

448.    Under S.D. Codified Laws § 37-24-31, Plaintiffs are entitled to a recovery of their  actual damages suffered as a result of Defendant's acts and practices.

### Violation of the Tennessee Consumer Protection Act
### (Tenn. Code Ann. §§ 47-18-101, *et seq.*)

449.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

450.    Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "(11) [m]aking false or misleading statements of fact concerning the reasons for, existence  of, or amounts of price reductions." Tenn. Code Ann. § 47-18-104.

451.    Plaintiffs and class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

452.    Each Defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(13).

453.     Each Defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

454.     Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs seek monetary relief against each Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

**Violation of the Texas Deceptive Trade Practices Consumer Protection Act**
**(Tex. Bus. & Com. Code §§ 17.41, *et seq.*)**

455.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

456.     Texas CPA prohibits "(a) [f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" including "(11) making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions" Tex. Bus. & Com. Code § 17.46.

457.     Levemir, Lantus, Novolog, and Humalog are "goods" under the Texas Deceptive Trade Practices and Consumer Protection Act ("Texas CPA").

458.     Plaintiffs and Class members are "consumers" as defined by Tex. Bus. & Com. Code § 17.45(a).

459.     Defendants are "persons" as defined by Tex. Bus. & Com. Code § 17.45(3).

460.     The advertising, distribution, offering for sale, and sale of Levemir, Lantus, Novolog, and Humalog are "trade" and "commerce" within the meaning of Tex. Bus. Com. Code § 17.45(6)

461.     Plaintiffs seek an order enjoining each  Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and   proper relief available under the Tex. Bus. Com. Code § 17.50.

### Violation of the Utah Consumer Sale Practices Act
### (Utah Code Ann. § 13-11-1, *et seq.*)

462.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

463.     The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not."  Utah Code Ann. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  Utah Code Ann. § 13-11-5.

464.     Defendants knew, or had reason to know, that consumers would rely on Defendants' reported benchmark price as the price of insulin, and knew that, given the real benchmark price difference that Defendants had created, the insulin benchmark price was not a fair  or reasonable approximation of the actual cost of insulin.  Defendants therefore engaged in an   unconscionable act within the meaning of Utah Code Ann. § 13-11-5.

465.     Plaintiffs and Class Members are "person[s]" within the meaning of Utah Code Ann. § 13-11-3(5).

466.     Defendants are "supplier[s]" within the meaning of Utah Code Ann. § 13-11-3(6).

467.     Defendants' sales of Lantus, Humalog, Novolog, and Levemir to Plaitniffs and Class members for "primarily personal, family, or household purposes" constitute "consumer transaction[s]" under Utah Code Ann. § 13-11-3(2).

468.     Pursuant to Utah Code Ann. § 13-11-19, Plaintiffs seek actual damages; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

**Violation of the Vermont Consumer Fraud Act**
**(Vt. Stat. Ann. tit. 9, § 2451, e*t seq*.)**

469.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

470.     The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." Vt. Stat. Ann. tit. 9, § 2453(a).

471.     Plaitniffs and members of the Class are "consumer[s] within the meaning of Vt. Stat. Ann. tit. 9, § 2451a(a).

472.     Defendants were sellers within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

473.     Lantus, Levemir, Humalog, and Novolog constitute "goods" under Vt. Stat. Ann. tit. 9, § 2451a(b).

474.     Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

**Violation of the Virginia Consumer Protection Act**
**(Va. Code Ann. §§ 59.1-196, *et seq.*)**

475.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

476.     The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "(9) [m]aking false or misleading statements of fact concerning the

reasons for, existence of, or amounts of price reductions;" and "(14) [u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200(A).

477.    Plaintiffs    and    members    of    the    Class    are "person[s]" under the Va. Code Ann. § 59.1-198.

478.    Each Defendant is a "supplier" under Va. Code Ann. § 59.1-198.

479.    Defendants' advertisement of the insulin benchmark price was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

480.    Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff.  Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

481.    Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the Virginia CPA.

### Violation of the U.S. Virgin Islands Consumer Protection Act
### (12A V.I.C. §§ 101, *et seq.*)

482.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

483.    The Virgin Islands Consumer Protection Act ("Virgin Islands CPA") provides that that "No person shall engage in any deceptive or unconscionable trade practice in the sale, lease, rental or loan or in the offering for sale, lease, rental, or loan of any consumer goods or services, or in the collection of consumer debts."  12A V.I.C. § 101.

484.     Lantus, Levemir, Novolog, and/or Humalog are "consumer goods" within the meaning of 12A V.I.C. § 102(c).

485.     Plaintiffs are "consumers" within the meaning of 12A V.I.C. § 102(d).

486.     Defendants are "merchants" within the meaning of 12A V.I.C. § 102(e).

487.     Plaintiffs also seek an order enjoining each Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the Virgin Islands CPA.

**Violation of the Washington Consumer Protection Act**
**(Wash. Rev. Code Ann. §§ 19.86.010, *et seq.*)**

488.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

489.     The Washington Consumer Protection Act ("Washington CPA") broadly prohibits  "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any  trade or commerce." Wash. Rev. Code. Ann. § 19.86.020.

490.     Defendants, Plaintiffs, and members of the Class are "person[s[]" within the meaning of Wash. Rev. Code Ann. § 19.86.010(1).

491.     Defendants committed the acts complained of herein in the course of "trade" and "commerce" within the meaning of Wash. Rev. Code. Ann. § 19.86.010(3).

492.     Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code. Ann. § 19.86.090.

**Violation of the West Virginia Consumer Credit And Protection Act
(W. VA. Code § 46A-1-101, *et seq.*)**

493.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

494.     West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104.

495.     Plaintiffs and members of the class are "consumer[s]" within the meaning of W. Va. Code § 46A-6-102(2).

496.     Defendants' conduct related to the sale of Lantus, Levemir, Novolog, and Humalog constitutes "consumer transaction[s]" and "sales" under W. Va. Code § 46A-6-102(2) and (5).

497.     Defendants conduct constitutes "trade" and "commerce" within the meaning of W. Va. Code § 46A-6-102(6).

498.     Pursuant to W. Va. Code § 46A-6-106, Plaintiffs seek an order enjoining each Defendant's unfair and/or deceptive acts or practices and attorneys' fees, and any other just and proper relief available under West Virginia CCPA.

**Violation of the Wisconsin Deceptive Trade Practices Act
(Wis. Stat. §§ 110.18, *et seq.*)**

499.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

500.     The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

501.     Each Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

502.     Plaintiffs and class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).  Plaintiffs purchased insulin.

503.     Plaintiffs are entitled to damages, attorney's fees, and other relief provided for under Wis. Stat. § 100.18(11)(b)(2).  Because Defendants' conduct was committed knowingly and/or  intentionally, Plaintiffs are entitled to treble damages.  Wis. Stat. § 110.18(11)(b)(2).

**Violation of the Wyoming Consumer Protection Act**
**(Wyo. Stat. §§ 40-12-101,** *et seq.***)**

504.     Plaintiffs hereby incorporate by  reference the allegations contained in the preceding paragraphs of this complaint.

505.     The Wyoming Consumer Protection Act ("Wyoming CPA") prohibits "engag[ing] in a deceptive trade practice," which includes, but is not limited to, "(vii) [m]ak[ing] false or misleading statements of fact concerning the price of merchandise or the reason for, existence of, or amounts of a price reduction."  Wyo. Stat. § 40-12-105.

506.     Levemir, Lantus, Novolog, and Humalog are "merchandise" under the Wyo. Stat. § 40-12-102(vi).

507.     Defendants are "persons" under Wyo. Stat. § 40-12-102(i).

508.     The advertising, offering for sale, and sale of Levemir, Lantus, Novolog, and Humalog is "consumer transaction" under Wyo. Stat. § 40-12-102(ii).

509.     Plaintiffs seek an order enjoining each  Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and  proper relief available under the WYCPA.

## COUNT FIVE

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.***

510.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

511.    This claim is brought on behalf of the class against Novo Nordisk for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

512.    Defendants are a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

513.    Plaintiffs and the members of the Class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Novo Nordisk's wrongful conduct.

### A.    The Levemir/Novolog Pricing Enterprise

514.    Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

515.    Novo Nordisk formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Levemir/Novolog Pricing Enterprise. The Levemir/Novolog Pricing Enterprise consists of (a) Novo Nordisk, including its employees and agents; (b) the PBM CVS, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

516.     The Levemir/Novolog Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose: to secure an exclusive, or at least favorable, formulary position for Novo Nordisk's long-acting analog insulin product, Levemir, and its rapid-acting analog insulin product, Novolog, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

517.     To accomplish this purpose, the Levemir/Novolog Pricing Enterprise periodically  and systematically inflated the benchmark prices of Levemir and Novolog, misrepresented the true purpose of the rebates to PBMs and exclusionary formularies and, represented—  either affirmatively or through half-truths and omissions—to the general public, health care  payers, and consumers, including Plaintiffs and the class, that Levemir and Novolog's  benchmark prices fairly and accurately reflected the actual cost of this drug. The Enterprise concealed from the  public, health care payers, and consumers, like Plaintiffs and the class members, the  existence and amount of steep rebates Novo Nordisk gave to the PBMs. The Levemir/Novolog Pricing  Enterprise also concealed from the public the purpose of these rebates: The difference between  the benchmark price and the real prices of Levemir and Novolog negotiated by the PBMs  resulted in increased profits for the PBMs. These large rebates served to ensure that the PBMs would place, and maintain, Levemir and Novolog in a preferred or favorable position on the  PBMs' formularies. By securing a favorable position on the formulary, the Levemir/Novolog  Pricing Enterprise ensured that a larger number of Levemir and Novolog prescriptions would be  written and filled. This scheme translated into higher sales (and therefore profits) for Novo  Nordisk and larger rebates for the PBMs.

518.     The persons engaged in the Levemir/Novolog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Novo Nordisk. There is regular communication between Novo Nordisk and each of the PBMs, in which information is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Novo Nordisk and the PBMs share information regarding the Levemir and Novolog benchmark prices and discuss and agree on rebate amounts. Novo Nordisk and the PBMs functioned as a continuing unit for the purposes of implementing the Levemir and Novolog pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

519.     At all relevant times, CVS was aware of Novo Nordisk's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. CVS struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and Novolog and profit from the inflated rebates. CVS represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs. But it knew that the rebates did not actually decrease the costs of Levemir and Novolog for consumers, because the published benchmark prices were falsely inflated. CVS also knew, but did not disclose, that the other PBMs—Express Scripts and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Levemir/Novolog Pricing Enterprise's unlawful fraud, CVS would have had the incentive to disclose the deceit by Novo Nordisk, thereby forcing competition on real price. By failing to disclose this information, CVS perpetuated the Levemir/Novolog Pricing Enterprise's scheme, and reaped substantial profits.

520.     At all relevant times, Express Scripts was aware of Novo Nordisk's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. Express Scripts struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and Novolog and profit from the inflated rebates. Express Scripts represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs. But it knew that the rebates did not actually decrease the costs of Levemir and Novolog for consumers, because the published benchmark prices were falsely inflated. Express Scripts also knew, but did not disclose, that the other PBMs—CVS and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Levemir/Novolog Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, Express Scripts perpetuated the Levemir/Novolog Pricing Enterprise's scheme, and reaped substantial profits.

521.     At all relevant times, OptumRx was aware of Novo Nordisk's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. OptumRx struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and Novolog and profit from the inflated rebates. OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs. But it knew that the rebates did not actually decrease the costs of Levemir and Novolog for consumers, because the published benchmark prices were falsely inflated. OptumRx also knew, but did not disclose, that the other PBMs—CVS and Express Scripts—were engaged in the same rebating scheme, to the detriment of consumers. But for the Levemir/Novolog Pricing Enterprise's unlawful fraud, OptumRx would have been

incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, OptumRx perpetuated the Levemir/Novolog Pricing Enterprise's scheme, and reaped substantial profits.

522.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs did not challenge Novo Nordisk's reported benchmark prices, terminate their role in the Levemir/Novolog Pricing Enterprise, nor disclose publicly that the Levemir and Novolog benchmark prices did not accurately reflect the price actually paid by most, if not all, pharmaceutical entities in the supply chain for the drugs.

523.    CVS, Express Scripts, and OptumRx participated in the conduct of the Levemir/Novolog Pricing Enterprise, sharing the common purpose of securing exclusive or favorable formulary positions for Levemir and Novolog, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343. The PBMs knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

a.    The actual prices of Levemir and Novolog;

b.    The extent to which the actual prices of Levemir and Novolog departed from the published, artificially-inflated benchmark prices;

c.    The extent to which Novo Nordisk and the PBMs had negotiated the rebates discounting the benchmark prices of Levemir and Novolog in good faith and for a proper purpose;

d.      Whether the rebates were intended to benefit health care payers, plan members, and/or the general public;

e.      Whether the rebates saved health care payers, plan members, and the general public money;

f.      Whether Levemir and Novolog's "preferred" formulary status reflected the drug's safety, efficacy, or cost-effectiveness, as determined by the PBMs;

g.      Whether Levemir and Novolog would have been placed in a "preferred" formulary position absent the rebates; and

h.      The extent to which the rebating scheme would force plan members to incur additional expenses for their Levemir and Novolog prescriptions.

524.    Novo Nordisk alone could not have accomplished the purpose of the Levemir/Novolog Pricing Enterprise, without the assistance of the PBMs.  For Novo Nordisk to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formulary, on which Levemir and Novolog were given favorable treatment.  And the PBMs did so through misrepresentations:  they told clients, potential clients, and investors that they secured significant discounts.  However, these discounts were only significant because the benchmark prices were artificially inflated.  The discounts were fictitious:  the result of a deliberate scheme to create large rebates without lowering real prices.  Without these misrepresentations, the Levemir/Novolog Pricing Enterprise could not have achieved its common purpose.

525.    The Levemir/Novolog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands

of class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

526.    The impacts of the Levemir/Novolog Pricing Enterprise's scheme are still in place—*i.e*., the increased rebates for Levemir and Novolog are still being maintained, and increased. Consequently,  PBMs and pharmacies make a profit on the difference between benchmark price and the actual  acquisition cost—*i.e*., the rebates.  Under this system, a higher benchmark-to-real price difference results in increased profits  to PBMs and pharmacies.

527.    The foregoing evidenced that Novo Nordisk, CVS, Express Scripts, and OptumRx were each willing participants in the Levemir/Novolog Pricing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e*., through Novo Nordisk's artificial inflation of the Levemir and Novolog benchmark prices, coupled with Novo Nordisk's and the PBMs' creation of substantial rebates, and the PBMs' misstatements to the drug-purchasing public that those rebates benefitted health care payer and consumers like Plaintiffs and the class.

**B.    Conduct of the Levemir/Novolog Pricing Enterprise**

528.    During  the  class  period,  Novo  Nordisk  exerted  control  over  the Levemir/Novolog  Pricing Enterprise and participated in the operation or management of the affairs of the  Levemir/Novolog Pricing Enterprise, directly or indirectly, in the following ways:

  a.    Novo Nordisk selected and published the Levemir and Novolog benchmark prices;

  b.    Novo Nordisk periodically raised the published Levemir and Novolog benchmark prices;

c.      Novo Nordisk granted to the PBMs substantial rebates representing discounts off of the Levemir and Novolog benchmark prices in exchange for the PBMs' promise to give Levemir and Novolog exclusive or at least favorable, formulary placement;

d.      Novo Nordisk concealed from the public the amount and purpose of the rebates;

e.      Novo Nordisk intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Levemir and Novolog) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

f.      Representing to the general public, through stating of Levemir and Novolog's benchmark prices without stating that the benchmark prices differed substantially from that negotiated by the PBMs, that the Levemir and Novolog benchmark prices reflected or approximated Levemir and Novolog's actual costs.

529.    The scheme had a hierarchical decision-making structure that was headed by Novo Nordisk.  Novo Nordisk controlled the Levemir and Novolog benchmark prices, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Levemir and Novolog would receive exclusive, or at least favorable, formulary placement.

530.    The PBMs also participated in the conduct of the affairs of the Levemir/Novolog Pricing Enterprise, directly or indirectly, in the following ways:

The PBMs promised to, and did, confer on Levemir and Novolog  exclusive or at least favorable formulary placement;

a.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Levemir

and Novolog) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

> b.      The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

531.    The scheme devised and implemented by Novo Nordisk, as well as other members of the Levemir/Novolog Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Levemir and Novolog; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Levemir and Novolog written by plan members' physicians.

### C.    Novo Nordisk's Pattern of Racketeering Activity

532.     Novo Nordisk conducted and participated in the conduct of the affairs of the Levemir/Novolog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern of racketeering activity by the Levemir/Novolog Pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Levemir and Novolog pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Novo Nordisk and the PBMs intended to defraud Plaintiffs, members of the class, and other intended victims.

533.     Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the class.  Novo Nordisk

and the PBMs calculated and intentionally crafted the Levemir and Novolog pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the class who would be over-billed for Levemir and Novolog. In designing and implementing the scheme, at all times Novo Nordisk was cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs in setting benchmark prices and establishing rebates.

534.     By intentionally and artificially inflating the Levemir and Novolog benchmark prices, and then subsequently failing to disclose such practices to the individual patients, health plans, and insurers, Novo Nordisk and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

535.     Novo Nordisk's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the class. Each separate use of the U.S. Mail and/or interstate wire facilities employed by Novo Nordisk was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the class. Novo Nordisk has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Levemir/Novolog Pricing Enterprise.

536.     The pattern of racketeering activity alleged herein and the Levemir/Novolog Pricing Enterprise are separate and distinct from each other. Likewise, Novo Nordisk is distinct from the Levemir/Novolog Pricing Enterprise.

537.     The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

**D.     Novo Nordisk's Use of the U.S. Mail and Interstate Wire Facilities**

538.     The Levemir/Novolog Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries:  the transmission and publication of false and misleading information concerning the Levemir and Novolog benchmark prices; the payment from Novo Nordisk to the PBMs of substantial rebates off of the benchmark price; and transmission of false or incomplete statements intended to mislead health care payers and consumers regarding the existence, amount, and purpose of the rebates.

539.     During the class period, the Levemir/Novolog Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

540.     The nature and pervasiveness of the Levemir and Novolog pricing fraud scheme, which was orchestrated out of the corporate headquarters of Novo Nordisk and each PBM, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

541.     Many of the precise dates of the Levemir/Novolog Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Novo Nordisk's, CVS's, Express Scripts's, and OptumRx's books and records.  Indeed, an essential part of  the successful

operation of the Enterprise alleged herein depended upon secrecy. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below.

542.     Novo Nordisk's use of the U.S. Mail and interstate wire facilities to perpetrate the Levemir and Novolog pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

> a.     Marketing materials about Novo Nordisk's Levemir and Novolog products and its price, which Novo Nordisk sent to health care payers and health care providers located across the country;

> b.     Written communications between Novo Nordisk and the publishers of benchmark price compendia regarding the Levemir and Novolog benchmark prices and their subsequent mark-ups, which occurred on a regular basis each year;

> c.     Written representations and telephone calls between Novo Nordisk and CVS regarding Levemir and Novolog markups and benchmark prices;

> d.     Written representations and telephone calls between Novo Nordisk and Express Scripts regarding Levemir and Novolog markups and benchmark prices;

> e.     Written representations and telephone calls between Novo Nordisk and OptumRx regarding Levemir and Novolog markups and benchmark prices;

> f.     Written representations and telephone calls between Novo Nordisk and CVS regarding Levemir and Novolog rebates;

> g.     Written representations and telephone calls between Novo Nordisk and Express Scripts regarding Levemir and Novolog rebates;

      h.     Written representations and telephone calls between Novo Nordisk and OptumRx regarding Levemir and Novolog rebates;

      i.     Hundreds of e-mails between Novo Nordisk and the PBMs agreeing to or effectuating the implementation of the Levemir and Novolog pricing fraud scheme;

      j.     Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Levemir and Novolog benchmark prices were; the existence, amount, or purpose of the Levemir and Novolog rebates; and the true costs of Levemir and Novolog that were designed to conceal the scheme, deter investigations into Levemir and Novolog pricing, or forestall changes to healthcare payers reimbursement of Levemir and Novolog prescriptions based on something other than Levemir and Novolog benchmark prices; and

      k.     receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

543.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Novo Nordisk that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payers and consumers like Plaintiffs and class members.

**E.    Damages Caused by Novo Nordisk's Levemir and Novolog Pricing Fraud**

544.    Novo Nordisk's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and class members to be injured in their business or property because Plaintiffs and class members have paid inflated out-of-pocket expenses for Levemir and/or Novolog.

545.    As described above, when a healthcare consumer fills a prescription for a drug like Levemir and/or Novolog, she is responsible for paying all or a portion of the medication's cost.  If the consumer is uninsured, she is responsible for 100% of the drug's costs.  If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drugs cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

546.    The amount of each of these cash payments is based on the drug's benchmark price.  Therefore, when Novo Nordisk, through the Levemir/Novolog Pricing Enterprise, artificially inflates the Levemir and Novolog benchmark prices, it also artificially inflates the consumers' out-of-pocket expenses.

547.    Plaintiffs' injuries, and those of the class members, were proximately caused by Novo Nordisk's racketeering activity.  But for the misstatements made by Novo Nordisk and the PBMs and the pricing scheme employed by the Levemir/Novolog Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for their out-of-pocket Levemir and Novolog expenses.

548.    Plaintiffs' injuries were directly caused by Novo Nordisk's racketeering activity. Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible payments (by private and public plan members), and payments made in the Donut Hole (for Medicare members).  So, although the misstatements made by the PBMs in furtherance of the

Levemir/Novolog Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility. Therefore, the health care payers did not suffer the overcharges that are the harms alleged in this suit.

549.    And although the Levemir/Novolog Pricing Enterprise was effectuated to give Novo Nordisk a wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Novo Nordisk's competitors.

550.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and  there are no other Plaintiffs or class of plaintiffs better situated to seek a remedy for the economic  harms to consumers from Novo Nordisk's fraudulent scheme.

551.    By virtue of these violations of 18 U.S.C. § 1962(c), Novo Nordisk is liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

<u>**COUNT SIX**</u>

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.***

552.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of  this complaint.

553.    This claim is brought on behalf of the class against Eli Lilly for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

554.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

555.     Plaintiffs and the members of the Class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Eli Lilly's wrongful conduct.

**A.     The Humalog Pricing Enterprise**

556.     Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

557.     Eli Lilly formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Humalog Pricing Enterprise. The Humalog Pricing Enterprise consists of (a) Eli Lilly, including its employees and agents; (b) the PBM CVS, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

558.     The Humalog Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose: to secure an exclusive, or at least favorable, formulary position for Eli Lilly's long-acting analog insulin product, Humalog, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

559.     To accomplish this purpose, the Humalog Pricing Enterprise periodically and systematically inflated the benchmark price of Humalog, misrepresented the true purpose of the rebates to PBMs and exclusionary formularies and, represented—either affirmatively or through half-truths and omissions—to the general public, health care payers, and consumers, including Plaintiffs and the class, that Humalog' benchmark price fairly and accurately reflected the actual

cost of this drug. The Enterprise concealed from the public, health care payers, and consumers, like Plaintiffs and class members, the existence and amount of steep rebates Eli Lilly gave to the PBMs. The Humalog Pricing Enterprise also concealed from the public the purpose of these rebates: The difference between the benchmark price and the real price of Humalog negotiated by the PBMs resulted in increased profits for the PBMs. These large rebates served to ensure that the PBMs would place, and maintain, Humalog in a preferred or favorable position on the PBMs' formularies. By securing a favorable position on the formulary, the Humalog Pricing Enterprise ensured that a larger number of Humalog prescriptions would be written and filled. This scheme translated into higher sales (and therefore profits) for Eli Lilly and larger rebates for the PBMs.

560. The persons engaged in the Humalog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Eli Lilly. There is regular communication between Eli Lilly and each of the PBMs, in which information is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Eli Lilly and the PBMs share information regarding the Humalog benchmark price and discuss and agree on rebate amounts. Eli Lilly and the PBMs functioned as a continuing unit for the purposes of implementing the Humalog pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

561. At all relevant times, CVS was aware of Eli Lilly's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. CVS struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the inflated rebates. CVS represented to the public that the rebates it negotiated saved health care payers and their plan

members (including Plaintiffs and members of the class) money  on their prescription needs.  But it knew that the rebates did not actually decrease the cost of  Humalog for consumers, because the published benchmark price were falsely inflated.  CVS also knew, but did not disclose, that the other PBMs—Express Scripts and  OptumRx—were engaged in the same rebating scheme, to the detriment of consumers.  But for  the Humalog Pricing Enterprise's unlawful fraud, CVS would have had the incentive to  disclose the deceit by Eli Lilly, thereby forcing competition on real price.  By failing to disclose  this information, CVS perpetuated the  Humalog Pricing Enterprise's scheme, and reaped substantial profits.

562.     At all relevant times, Express Scripts was aware of Eli Lilly's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  Express Scripts struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the inflated rebates.  Express Scripts represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that the rebates did not actually decrease the cost of Humalog for consumers, because the published benchmark prices were falsely inflated.  Express Scripts also knew, but did not disclose, that the other PBMs—CVS and OptumRx—  were engaged in the same rebating scheme, to the detriment of consumers.  But for the Humalog Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage.  By failing to disclose this information, Express Scripts perpetuated the Humalog Pricing Enterprise's scheme, and reaped substantial profits.At all relevant times, OptumRx was aware of Eli Lilly's conduct, was a knowing  and willing participant in that conduct, and reaped profits from that conduct.  OptumRx struck  rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the

inflated rebates. OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs. But it knew that the rebates did not actually decrease the cost of Humalog for consumers, because the published benchmark prices were falsely inflated. OptumRx also knew, but did not disclose, that the other PBMs—CVS and Express Scripts— were engaged in the same rebating scheme, to the detriment of consumers. But for the Humalog Pricing Enterprise's unlawful fraud, OptumRx would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, OptumRx perpetuated the Humalog Pricing Enterprise's scheme, and reaped substantial profits.

563. Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs did not challenge Eli Lilly's reported benchmark prices, terminate their role in the Humalog Pricing Enterprise, nor disclose publicly that the Humalog benchmark price did not accurately reflect the price actually paid by most, if not all, pharmaceutical entities in the supply chain for the drug.

564. CVS, Express Scripts, and OptumRx participated in the conduct of the Humalog Pricing Enterprise, sharing the common purpose of securing exclusive or favorable formulary position for Humalog, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343. The PBMs knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

a.      The actual price of Humalog;

b.      The extent to which the actual price of Humalog departed from the published, artificially-inflated benchmark price;

c.      The extent to which Eli Lilly and the PBMs had negotiated the rebates discounting the benchmark price of Humalog in good faith and for a proper purpose;

d.      Whether the rebates were intended to benefit health care payers, plan members, and/or the general public;

e.      Whether the rebates saved health care payers, plan members, and the general public money;

f.      Whether Humalog's "preferred" formulary status reflected the drug's safety, efficacy, or cost-effectiveness, as determined by the PBMs;

g.      Whether Humalog would have been placed in a "preferred" formulary position absent the rebates; and

h.      The extent to which the rebating scheme would force plan members to incur additional expenses for their Humalog prescriptions.

565.    Eli Lilly alone could not have accomplished the purpose of the Humalog Pricing Enterprise, without the assistance of the PBMs. For Eli Lilly to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formulary, on which Humalog was given favorable treatment. And the PBMs did so through misrepresentations: they told clients, potential clients, and investors that they secured significant discounts. However, these discounts were only significant because the benchmark prices were artificially inflated. The discounts were fictitious: the result of a deliberate scheme to create

large rebates without lowering real prices. Without these misrepresentations, the Humalog Pricing Enterprise could not have achieved its common purpose.

566.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands of class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

567.    The impacts of the Humalog Pricing Enterprise's scheme are still in place—*i.e.*, the increased rebates for Humalog are still being maintained, and increased. Consequently, PBMs and pharmacies make a profit on the difference between benchmark price and the actual acquisition cost—*i.e.*, the rebates. Under this system, a higher benchmark-to-real price difference results in increased profits to PBMs and pharmacies.

568.    The foregoing evidenced that Eli Lilly, CVS, Express Scripts, and OptumRx were each willing participants in the Humalog Pricing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through Eli Lilly's artificial inflation of the Humalog benchmark price, coupled with Eli Lilly's and the PBMs' creation of substantial rebates, and the PBMs' misstatements to the drug-purchasing public that those rebates benefitted health care payer and consumers like Plaintiffs and the class.

**B.    Conduct of the Humalog Pricing Enterprise**

569.    During the class period, Eli Lilly exerted control over the Humalog Pricing Enterprise and participated in the operation or management of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

a.    Eli Lilly selected and published the Humalog benchmark price;

b.      Eli Lilly periodically raised the published Humalog benchmark price;

c.      Eli Lilly granted to the PBMs substantial rebates representing discounts off of the Humalog benchmark price in exchange for the PBMs' promise to give Humalog exclusive or at least favorable, formulary placement;

d.      Eli Lilly concealed from the public the amount and purpose of the rebates;

e.      Eli Lilly intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Humalog) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

f.      Representing to the general public, through stating of Humalog's benchmark price without stating that the benchmark price differed substantially from that negotiated by PBMs, that the Humalog benchmark price reflected or approximated Humalog's actual cost.

570.    The scheme had a hierarchical decision-making structure that was headed by Eli Lilly.  Eli Lilly controlled the Humalog benchmark price, and doled out rebates to the PBMs in  exchange for the PBMs' assurances that Humalog would receive exclusive, or at least favorable,  formulary placement.

571.    The PBMs also participated in the conduct of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

a.      The PBMs promised to, and did, confer on Humalog exclusive or at least favorable formulary placement;

b.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Humalog) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

c.      The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

572.     The scheme devised and implemented by Eli Lilly, as well as other members of the  Humalog Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Humalog; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Humalog written by plan members' physicians.

**C.      Eli Lilly's Pattern of Racketeering Activity**

573.      Eli Lilly conducted and participated in the conduct of the affairs of the Humalog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern of racketeering activity by the Humalog pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Humalog pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Eli Lilly and the PBMs intended to defraud Plaintiffs, members of the class, and other intended victims.

574.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the class.  Eli Lilly and the PBMs calculated and intentionally crafted the Humalog pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the class who would be over-billed for Humalog.  In designing and implementing the scheme, at all times Eli Lilly was cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs  in setting benchmark prices and establishing rebates.

575.    By intentionally and artificially inflating the Humalog benchmark price, and then subsequently failing to disclose such practices to the individual patients, health plans, and insurers, Eli Lilly and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

576.    Eli Lilly's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the class.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Eli Lilly was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the class.  Eli Lilly has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Humalog Pricing Enterprise.

577.    The pattern of racketeering activity alleged herein and the Humalog Pricing Enterprise are separate and distinct from each other.  Likewise, Eli Lilly is distinct from the Humalog Pricing Enterprise.

578.     The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

**D.     Eli Lilly's Use of the U.S. Mail and Interstate Wire Facilities**

579.     The Humalog Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning the Humalog benchmark price; the payment from Eli Lilly to the PBMs of substantial rebates off of the benchmark price; and transmission of false or incomplete statements intended to mislead health care payers and consumers regarding the existence, amount, and purpose of the rebates.

580.     During the class period, the Humalog Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

581.     The nature and pervasiveness of the Humalog pricing fraud scheme, which was orchestrated out of the corporate headquarters of Eli Lilly and each PBM, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

582.     Many of the precise dates of the Humalog Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to these Eli Lilly's, CVS's, Express Scripts's, and OptumRx's books and records.  Indeed, an essential part of  the successful operation of the Enterprise alleged herein depended upon secrecy.  However,  Plaintiffs can

generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the Scheme; Plaintiffs describe this below.

583.    Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the Humalog pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

a.    Marketing materials about Eli Lilly's Humalog product and its price, which Eli Lilly sent to health care payers and health care providers located across the country;

b.    Written communications between Eli Lilly and the publishers of benchmark price compendia regarding the Humalog benchmark price and its subsequent mark-ups, which occurred on a regular basis each year;

c.    Written representations and telephone calls between Eli Lilly and CVS regarding Humalog markups and benchmark price;

d.    Written representations and telephone calls between Eli Lilly and Express Scripts regarding Humalog markups and benchmark price;

e.    Written representations and telephone calls between Eli Lilly and OptumRx regarding Humalog markups and benchmark price;

f.    Written representations and telephone calls between Eli Lilly and CVS regarding Humalog rebates;

g.    Written representations and telephone calls between Eli Lilly and Express Scripts regarding Humalog rebates;

h.    Written representations and telephone calls between Eli Lilly and OptumRx regarding Humalog rebates;

i.        Hundreds of e-mails between Eli Lilly and the PBMs agreeing to or effectuating the implementation of the Humalog pricing fraud scheme;

j.        Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Humalog benchmark price was; the existence, amount, or purpose of the Humalog rebates; and the true cost of Humalog that were designed to conceal the scheme, deter investigations into Humalog pricing, or forestall changes to healthcare payers reimbursement of Humalog prescriptions based on something other than Humalog benchmark price; and

k.        Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme; and

584.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Eli Lilly that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payers and consumers like Plaintiffs and class members.

**E.    Damages Caused by Eli Lilly's Humalog Pricing Fraud**

585.    Eli Lilly's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and the class members to be injured in their business or property because Plaintiffs and class members have paid inflated out-of-pocket expenses for Humalog.

586.    As described above, when a healthcare consumer fills a prescription for a drug like Humalog, she is responsible for paying all or a portion of the medication's cost. If the consumer is uninsured, she is responsible for 100% of the drug's costs. If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her

deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drugs cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

587.     The amount of each of these cash payments is based on the drug's benchmark price.  Therefore, when Eli Lilly, through the Humalog Pricing Enterprise, artificially inflates the Humalog benchmark price, it also artificially inflates the consumers' out-of-pocket expenses.

588.     Plaintiffs' injuries, and those of the class members, were proximately caused by Eli Lilly's racketeering activity.  But for the misstatements made by Eli Lilly and the PBMs, and the pricing scheme employed by the Humalog Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for their out-of-pocket Humalog expenses.

589.     Plaintiffs' injuries were directly caused by Eli Lilly's racketeering activity.  Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible payments (by private and public plan members), and payments made in the "Donut Hole" (for Medicare members).  So, although the misstatements made by the PBMs in furtherance of the Humalog Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility.  Therefore, the health care payers did not suffer the overcharges that are the harms alleged in this suit.

590.     And although the Humalog Pricing Enterprise was effectuated to give Eli Lilly a wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Eli Lilly's competitors.

591.     Plaintiffs and those similarly situated were most directly harmed by the fraud, and  there is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic  harms to consumers from Eli Lilly's fraudulent scheme.

592.     By virtue of these violations of 18 U.S.C. § 1962(c), Eli Lilly is liable to Plaintiffs  for three times the damages Plaintiffs have sustained, plus the cost of this suit, including  reasonable attorneys' fees.

## COUNT SEVEN

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.*

593.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs  of this complaint.

594.     This claim is brought on behalf of the class against Sanofi for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

595.     Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

596.     Plaintiffs and the members of the Class are each "persons," as that term is defined  in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Sanofi's  wrongful conduct.

A.      **The Lantus Pricing Enterprise**

597.    Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

598.    Sanofi formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Lantus Pricing Enterprise. The Lantus Pricing Enterprise consists of (a) Sanofi, including its employees and agents; (b) the PBM CVS, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

599.    The Lantus Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose: to secure an exclusive, or at least favorable, formulary position for Sanofi's long-acting analog insulin product, Lantus, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

600.    To accomplish this purpose, the Lantus Pricing Enterprise periodically and systematically inflated the benchmark price of Lantus, misrepresented the true purpose of the rebates to PBMs and exclusionary formularies and, represented—either affirmatively or through half-truths and omissions—to the general public, health care payers, and consumers, including Plaintiffs and the class, that Lantus' benchmark price fairly and accurately reflected the actual cost of this drug. The Lantus Pricing Enterprise concealed from the public, health care payers, and consumers, like Plaintiffs and the class members, the existence and amount of steep rebates Sanofi gave to the PBMs.. The Lantus Pricing Enterprise also concealed from the public the

purpose of these rebates: The  difference between the benchmark price and the real price of Lantus negotiated by the PBMs  resulted in increased profits for the PBMs.  These large rebates served to ensure that the PBMs  would place, and maintain, Lantus in a preferred or favorable position on the PBMs' formularies.  By securing a favorable position on the formulary, the Lantus Pricing Enterprise ensured that a  larger number of Lantus prescriptions would be written and filled.  This scheme translated into  higher sales (and therefore profits) for Sanofi and larger rebates for the PBMs.

601.     The persons engaged in the Lantus Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Sanofi.  There is regular communication between Sanofi and each of the PBMs, in which information is shared.  Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Sanofi and the PBMs share information regarding the Lantus benchmark price and discuss and agree on rebate amounts.  Sanofi and the PBMs functioned as a continuing unit for the purposes of implementing the Lantus pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

602.     At all relevant times, CVS was aware of Sanofi's conduct, was a  knowing and willing participant in that conduct, and reaped profits from that conduct.  CVS struck rebate deals with Sanofi to conceal the true price of Lantus and profit from the  inflated rebates.  CVS represented to the public that the rebates it negotiated saved  health care payers and their plan members (including Plaintiffs and members of the class) money  on their prescription needs.  But it knew that the rebates did not actually decrease the cost of  Lantus for consumers, because the published benchmark prices were falsely inflated.  CVS also knew, but did not disclose, that the

other PBMs—Express Scripts and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Lantus Pricing Enterprise's unlawful fraud, CVS would have had the incentive to disclose the deceit by Sanofi, thereby forcing competition on real price. By failing to disclose this information, CVS perpetuated the Lantus Pricing Enterprise's scheme, and reaped substantial profits.

603.    At all relevant times, Express Scripts was aware of Sanofi's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. Express Scripts struck rebate deals with Sanofi to conceal the true price of Lantus and profit from the inflated rebates. Express Scripts represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs. But it knew that the rebates did not actually decrease the cost of Lantus for consumers, because the published benchmark prices were falsely inflated. Express Scripts also knew, but did not disclose, that the other PBMs—CVS and OptumRx— were engaged in the same rebating scheme, to the detriment of consumers. But for the Lantus Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, Express Scripts perpetuated the Lantus Pricing Enterprise's scheme, and reaped substantial profits.

604.    At all relevant times, OptumRx was aware of Sanofi's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. OptumRx struck rebate deals with Sanofi to conceal the true price of Lantus and profit from the inflated rebates. OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription

needs.  But it knew that the rebates did not actually decrease the cost of Lantus for consumers, because the published benchmark prices were falsely inflated.  OptumRx also knew, but did not disclose, that the other PBMs—CVS and Express Scripts—were engaged in the same rebating scheme, to the detriment of consumers.  But for the Lantus Pricing Enterprise's unlawful  fraud, OptumRx would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage.  By failing to disclose this information, OptumRx perpetuated the Lantus Pricing Enterprise's scheme, and reaped substantial profits.

605.    Furthermore, as public scrutiny, media coverage, and congressional investigations  have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs  did not challenge Sanofi's reported benchmark prices, terminate their role in the Lantus Pricing  Enterprise, nor disclose publicly that the Lantus benchmark price did not accurately reflect the  price actually paid by most, if not all, pharmaceutical entities in the supply chain for the drug.

606.    CVS, Express Scripts, and OptumRx participated in the conduct of the  Lantus Pricing Enterprise, sharing the common purpose of securing exclusive or favorable  formulary position for Lantus, through a pattern of racketeering activity within the meaning of  18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C.  § 1343.  The PBMs knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

a.    The actual price of Lantus;

b.    The extent to which the actual price of Lantus departed from the published, artificially-inflated benchmark price;

      c.      The extent to which Sanofi and the PBMs had negotiated the rebates discounting the benchmark price of Lantus in good faith and for a proper purpose;

      d.      Whether the rebates were intended to benefit health care payers, plan members, and/or the general public;

      e.      Whether the rebates saved health care payers, plan members, and the general public money;

      f.      Whether Lantus' "preferred" formulary status reflected the drug's safety, efficacy, or cost-effectiveness, as determined by the PBMs;

      g.      Whether Lantus would have been placed in a "preferred" formulary position absent the rebates; and

      h.      The extent to which the rebating scheme would force plan members to incur additional expenses for their Lantus prescriptions.

607.      Sanofi alone could not have accomplished the purpose of the Lantus Pricing Enterprise, without the assistance of the PBMs.  For Sanofi to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formulary, on which Lantus was given favorable treatment.  And the PBMs did so through misrepresentations:  they told clients, potential clients, and investors that they secured significant discounts.  However, these discounts were only significant because the benchmark prices were artificially inflated. The discounts were fictitious:  the result of a deliberate scheme to create large rebates without lowering real prices.  Without these misrepresentations, the Lantus Pricing Enterprise could not have achieved its common purpose.

608.      The Lantus Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands of class

members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

609.    The impacts of the Lantus Pricing Enterprise's scheme are still in place—*i.e.*, the increased rebates for Lantus are still being maintained, and increased.  Consequently, PBMs and pharmacies make a profit on the difference  between benchmark price and the actual acquisition cost—*i.e.*, the rebates.  Under this system, a  higher benchmark-to-real price difference results in increased profits to PBMs and pharmacies.

610.    The foregoing evidenced that Sanofi, CVS, Express Scripts, and  OptumRx were each willing participants in the Lantus Pricing Enterprise, had a common purpose  and interest in the object of the scheme, and functioned within a structure designed to effectuate  the Enterprise's purpose, *i.e.*, through Sanofi's artificial inflation of the Lantus benchmark price, coupled with Sanofi's and the PBMs' creation of substantial rebates, and the PBMs' misstatements to the drug-purchasing public that those rebates benefitted health care payer and consumers like Plaintiffs and the class.

**B.    Conduct of the Lantus Pricing Enterprise**

611.    During the class period, Sanofi exerted control over the Lantus Pricing Enterprise  and participated in the operation or management of the affairs of the Lantus Pricing Enterprise,   directly or indirectly, in the following ways:

    a.    Sanofi selected and published the Lantus benchmark price;

    b.    Sanofi periodically raised the published Lantus benchmark price;

    c.    Sanofi granted to the PBMs substantial rebates representing discounts off of the Lantus benchmark price in exchange for the PBMs' promise to give Lantus exclusive or at least favorable, formulary placement;

d.      Sanofi concealed from the public the amount and purpose of the rebates;

e.      Sanofi intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates   (such as those applied to Lantus) saved health care payers and consumers like Plaintiffs and class  members money on their prescription needs; and

f.      The public, through stating of Lantus' benchmark price without stating that the benchmark price differed substantially from that negotiated by PBMs, that the Lantus benchmark price reflected or approximated Lantus' actual cost.

612.     The scheme had a hierarchical decision-making structure that was headed by Sanofi.  Sanofi controlled the Lantus benchmark price, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Lantus would receive exclusive, or at least favorable, formulary placement.

613.     The PBMs also participated in the conduct of the affairs of the Lantus Pricing Enterprise, directly or indirectly, in the following ways:

a.      The PBMs promised to, and did, confer on Lantus exclusive or at least favorable formulary placement;

b.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Lantus) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

c.      The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

614.   The scheme devised and implemented by Sanofi, as well as other members of the Lantus Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Lantus; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Lantus written by plan members' physicians.

### C.   Sanofi's Pattern of Racketeering Activity

615.   Sanofi conducted and participated in the conduct of the affairs of the Lantus Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern of racketeering activity by the Lantus Pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Lantus pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Sanofi and the PBMs intended to defraud Plaintiffs, members of the class, and other intended victims.

616.   Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the class.  Sanofi and the PBMs calculated and intentionally crafted the Lantus pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the class who would be over-billed for Lantus.  In designing and implementing the scheme, at all times Sanofi was cognizant of the fact that those in the distribution chain who are not part of

the industry rely on the integrity of the pharmaceutical companies and PBMs in setting benchmark prices and establishing rebates.

617.    By intentionally and artificially inflating the Lantus benchmark price, and then subsequently failing to disclose such practices to the individual patients, health plans, and insurers, Sanofi and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

618.    Sanofi's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the class.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Sanofi was related, had similar intended purposes, involved similar participants and methods of  execution, and had the same results affecting the same victims, including Plaintiffs and members  of the class.  Sanofi has engaged in the pattern of racketeering activity for the purpose of  conducting the ongoing business affairs of its Lantus Pricing Enterprise.

619.    The pattern of racketeering activity alleged herein and the Lantus Pricing Enterprise are separate and distinct from each other.  Likewise, Sanofi is distinct from the Lantus Pricing Enterprise.

620.    The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

**D.    Sanofi's Use of the U.S. Mail and Interstate Wire Facilities**

621.    The Lantus Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries: the transmission and publication of false and misleading information concerning the Lantus benchmark price; the

payment from Sanofi to the PBMs of substantial rebates off of the benchmark price; and transmission of false or incomplete statements intended to mislead health care payers and consumers regarding the existence, amount, and purpose of the rebates.

622.    During the class period, the Lantus Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

623.    The nature and pervasiveness of the Lantus pricing fraud scheme, which was orchestrated out of the corporate headquarters of Sanofi and each PBM, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

624.    Many of the precise dates of the Lantus Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Sanofi's, CVS's, Express Scripts's, and OptumRx's books and records. Indeed, an essential part of the successful operation of the Lantus Pricing Enterprise alleged herein depended upon secrecy. However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below.

625.    Sanofi's use of the U.S. Mail and interstate wire facilities to perpetrate the Lantus pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

a.      Marketing materials about Sanofi's Lantus product and its price, which Sanofi sent to health care payers and health care providers located across the country;

b.      Written communications between Sanofi and the publishers of benchmark price compendia regarding the Lantus benchmark price and its subsequent mark-ups, which occurred on a regular basis each year;

c.      Written representations and telephone calls between Sanofi and CVS regarding Lantus markups and benchmark price;

d.      Written representations and telephone calls between Sanofi and Express Scripts regarding Lantus markups and benchmark price;

e.      Written representations and telephone calls between Sanofi and OptumRx regarding Lantus markups and benchmark price;

f.      Written representations and telephone calls between Sanofi and CVS regarding Lantus rebates;

g.      Written representations and telephone calls between Sanofi and Express Scripts regarding Lantus rebates;

h.      Written representations and telephone calls between Sanofi and OptumRx regarding Lantus rebates;

i.      Hundreds of e-mails between Sanofi and the PBMs agreeing to or effectuating the implementation of the Lantus pricing fraud scheme;

j.      Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Lantus benchmark price was; the existence, amount, or purpose of the Lantus rebates; and the true cost of Lantus that were designed to conceal the scheme, deter investigations into Lantus pricing, or forestall changes to

healthcare payers reimbursement of Lantus prescriptions based on something other than the Lantus benchmark price; and

k.      Receipts of increased profits sent through the U.S. Mail and interstate wire  facilities—the wrongful proceeds of the scheme.

626.     In addition to the above-referenced RICO predicate acts, it was foreseeable to Sanofi that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payers and consumers like Plaintiffs and class members.

**E.      Damages Caused by Sanofi's Lantus Pricing Fraud**

627.     Sanofi's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and the class members to be injured in their business or property because Plaintiffs and class members have paid inflated out-of-pocket expenses for Lantus.

628.     As described above, when a healthcare consumer fills a prescription for a drug like Lantus, she is responsible for paying all or a portion of the medication's cost.  If the consumer is uninsured, she is responsible for 100% of the drug's costs.  If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drugs cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

629.    The amount of each of these cash payments is based on the drug's benchmark price.  Therefore, when Sanofi, through the Lantus Pricing Enterprise, artificially inflates the Lantus benchmark price, it also artificially inflates the consumers' out-of-pocket expenses.

630.    Plaintiffs' injuries, and those of the class members, were proximately caused by Sanofi's racketeering activity.  But for the misstatements made by Sanofi and the PBMs and the pricing scheme employed by the Lantus Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for their out-of-pocket Lantus expenses.

631.    Plaintiffs' injuries were directly caused by Sanofi's racketeering activity.  Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible payments (by private and public plan members), and payments made in the "Donut Hole" (for Medicare members).  So, although the misstatements made by the PBMs in furtherance of the Lantus Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility.  Therefore, the health care payers did not suffer the overcharges that are the harms alleged in this suit.

632.    And although the Lantus Pricing Enterprise was effectuated to give Sanofi a wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Sanofi's competitors.

633.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and  there are no other Plaintiffs or class of plaintiffs better situated to seek a remedy for the economic  harms to consumers from Sanofi's fraudulent scheme.

634.    By virtue of these violations of 18 U.S.C. § 1962(c), Sanofi is liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Class pray for relief as set forth below:

A.    Certification of the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as class representatives for the Class and their counsel of record as class counsel for the Class;

B.    Permanent injunctive relief enjoining and restraining Defendants, their respective successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them from, in any manner, directly or indirectly, continuing to maintain or renew the combination, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition; and;

C.    That acts alleged herein be adjudged and decreed to be unlawful restraints of trade, and per se unreasonable restraints of trade, in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

D.    A judgment against Defendants, jointly and severally, for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, statutory penalties and other monetary relief provided by applicable law, including treble damages;

E.       An award to Plaintiffs and the members of the Class of pre-judgment and post-judgment interest as provided by law, calculated at the highest legal rate from and after the date of service of the Complaint in this action;

F.       The costs of this suit, including reasonable attorney fees;

G.       Such other and further relief as the Court deems just and proper.

## XVI.   DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims asserted herein that are so triable.

Dated: March 8, 2017                    Respectfully submitted,

                                        WEITZ & LUXENBERG
                                        *A New York Professional Corporation*

                                        By: /s/ Ellen Relkin
                                            Ellen Relkin


                                        Ellen Relkin (N.J. Attorney Bar #006691985)
                                        220 Lake Drive East, Suite 210
                                        Cherry Hill, NJ 08002
                                        Telephone:  (212) 558-5500
                                        Email: ERelkin@weitzlux.com

                                        Paul F. Novak (*pro hac vice* forthcoming)
                                        Diana Gjonaj (*pro hac vice* forthcoming)
                                        Gregory Stamatopoulos (*pro hac vice* forthcoming)
                                        WEITZ & LUXENBERG
                                        719 Griswold, Ste. 620
                                        Detroit, MI  48226
                                        Telephone:  (313) 800-4170
                                        Email: pnovak@weitzlux.com
                                               dgjonaj@weitzlux.com
                                               gstamatopoulos@weitzlux.com

Todd A. Seaver (*pro hac vice* forthcoming)
Jessica Moy (*pro hac vice* forthcoming)
William O. Bass (*pro hac vice* forthcoming)
BERMAN DEVALERIO
44 Montgomery St., Ste. 650
San Francisco, CA  94104
Telephone:  (415) 433-3200
Email:  tseaver@bermandevalerio.com
          jmoy@bermandevalerio.com
          wbass@bermandevalerio.com

Michelle Rago, Esq.
47 Merriam Avenue
Bronxville, New York 10708
(914) 441-4887
Email:  mrago@ragolaw.com

*Attorneys for Plaintiffs*

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all claims so triable IN THIS CIVIL ACTION, as

provided by Rule 34(b) of the Federal Rules of Civil Procedure.


Dated:  March 8, 2017                            **WEITZ & LUXENBERG, P.C.**

                                                 Attorneys for Plaintiff

                                                 A New York Professional Corporation
                                                 220 Lake Drive East, Suite 210
                                                 Cherry Hill, NJ 08002
                                                 Telephone:  (856) 755-1115
                                                 Facsimile (212) 344-5461
                                                 Email:  ERelkin@weitzlux.com


                                    By      /s/ Ellen Relkin_____

                                            Ellen Relkin
                                            (N.J. Attorney Bar #006691985)

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify, to the best of my knowledge that this matter is the subject of the *In re Insulin Pricing Litigation*, Civil Action No. 17-699 (BRM)(LHG), pending in this District Court before Judge Brian R. Martinotti.

Dated:  March 8, 2017

**WEITZ & LUXENBERG, P.C.**

Attorneys for Plaintiff

*A New York Professional Corporation*

220 Lake Drive East, Suite 210
Cherry Hill, NJ 08002
Telephone:  (856) 755-1115
Facsimile (212) 344-5461
Email:  ERelkin@weitzlux.com

By        /s/ Ellen Relkin

Ellen Relkin
(N.J. Attorney Bar #006691985)